John **KUCHARCZYK, Ph.D.,** an individual, and Michael Moseley, Ph.D., an individual, Plaintiffs,

v.

The **REGENTS OF the UNIVERSITY OF CALIFORNIA;** Nycomed Salutar, a California corporation; Nycomed Imaging AS, a Norwegian business entity, Defendants.

C–94–3886EFL.

United States District Court, N.D. California.

Sept. 11, 1996.

Richard D. Harmon, Megan Tootell, Jeffrey P. Gray, San Francisco, CA, for Plaintiffs.

Aimee D. Silvers, Cadwalader, Wickersham & Taft, Los Angeles, CA, Gerald P. Dodson, Arnold, White & Durkee, Palo Alto, CA, for Defendants.

## ORDER

LYNCH, District Judge.

## I. INTRODUCTION

Plaintiffs, both scientists who formerly worked for the University of California San Francisco ("UCSF"), are suing the Regents of the University of California ("the University"), Nycomed Salutar ("Salutar" or "Nycomed"), and Nycomed Imaging AS ("NIAS"), Salutar's parent company, alleging a number of theories in ten causes of action. Salutar has counterclaimed against plaintiffs and cross-claimed against the University.

This suit arises out of plaintiffs' invention of a process in the magnetic resonance imaging ("MRI") field and the University's subsequent licensing of that invention. The invention was eventually patented as U.S. Patent No. 5,190,744 ("'744 Patent"), entitled "Methods for Detecting Blood Perfusion Variations by Magnetic Resonance Imaging." The invention was a method of using DyDTPA–BMA, a chemical compound. Salutar owns the patent in DyDTPA–BMA. Dr. Scott Rocklage, a Salutar employee, was named on the '744 patent as a co-inventor, thereby giving Salutar an undivided right in the patent.

Plaintiffs assigned their rights in the invention to the University pursuant to a Patent Agreement they entered into upon their employment by the University. The Patent Agreement required plaintiffs to assign all inventions to the University and in turn obligated the University to pay them 50% of all royalties collected. Upon being assigned the invention, the University entered into an exclusive License Agreement with Salutar. Salutar agreed to pay the University a total of $25,000, half of which was paid to plaintiffs.

In essence, plaintiffs allege that they were the sole inventors of the process, that it was worth significantly more than $25,000, and that plaintiffs were entitled to greater rewards for their invention. Plaintiffs have alleged ten causes of action. First, plaintiffs allege that their civil rights, including their property rights, were impaired in violation of 42 U.S.C. § 1983.[1] Second, plaintiffs seek a declaration that they were sole inventors of the invention claimed by the '744 patent. Next, they allege that when the University entered into an exclusive licensing agreement with Salutar and accepted a lump-sum payment of only $25,000, the University breached its contract with plaintiffs which required it to secure a royalty-bearing, non-exclusive license. In their third cause of action, they seek rescission of the Assignment Agreements on the grounds that there was a "fundamental lack of actual, mutual agreement." Alternately, in their fourth cause of action, they seek monetary damages for the University's breach of contract. In their fifth cause of action, plaintiffs allege a conspiracy to induce the breach of contract and seek punitive damages. In their sixth cause of action, they claim that the University's breach of its contracts was tortious and fraudulent and in breach of the implied covenant of good faith and fair dealing. The seventh cause of action claims fraud and deceit in connection with their employment contracts and Assignment Agreements. Eighthly, plaintiffs claim negligent misrepresentation. In their ninth cause of action, plaintiffs allege that they were fraudulently induced to enter into employment agreements, Assignment Agreements, and other unspecified contracts with the Uni-

---

1. Plaintiffs initially filed a motion seeking to amend this cause of action on September 28, 1995. The hearing on that motion was deferred pending the Court's ruling on the summary judgment motions. On June 10, 1996, plaintiffs filed a Modified Motion for Leave to File Second Amended Complaint. In that Second Amended Complaint, plaintiffs drop their civil rights claim. Plaintiffs also filed a civil rights claim against Carl Wooten in San Francisco Superior Court. That action was removed to federal court and was related to this action. The second action is titled *Kucharczyk v. Wooten*, C–96–2247 EFL and is set for an initial status conference on October 8, 1996 at 8:45 a.m. In light of this procedural posture, the Court will not address plaintiffs' civil rights claim in this Order.

versity. Finally, in their tenth cause of action, plaintiffs allege that defendants Salutar and NIAS have tortiously interfered with their contracts with the University.

Plaintiffs and the University have filed cross-motions for summary judgment; plaintiffs seek summary adjudication of their breach of contract claim, and the University seeks summary judgment on all of plaintiffs' causes of action except the claim seeking a declaratory judgment removing Scott Rocklage as the inventor of the '744 patent.[2] The Court has requested and received supplemental briefing, and the matter has been extensively briefed and argued.

For the reasons set forth below, the Court will deny plaintiffs' motion for summary judgment and grant the University's motion. However, the Court will certify this case for interlocutory review.

## II. FACTS

Plaintiff Moseley was hired by the University in 1982 as an Associate Professor of Radiology at UCSF. Upon being hired, Moseley executed a form Patent Agreement that required him to assign all rights in any invention developed during his employment to the University. Plaintiff Kucharczyk joined the UCSF faculty in 1988 and was a tenured member of the UCSF Department of Radiology. Prior to his employment, Kucharczyk also signed a form Patent Agreement in which he agreed to assign all invention rights to the University.

The '744 Patent grew out of plaintiffs' work at the UCSF Department of Radiology in the late 1980s. Plaintiffs' research was initially funded by Syntex to assess therapeutic drugs used for stroke treatment. However, Syntex ended its funding, and Salutar began funding plaintiffs' research. Plaintiffs claim that on February 13, 1989, they conceived of the use of DyDTPA–BMA, a chemical compound invented by Salutar, as a contrasting agent useful in detecting strokes via MRI. On February 23, 1990, plaintiffs faxed a disclosure form to the University's Patent

Office discussing the invention and identifying the funding source or sponsor for the project as "Salutar, Inc." On March 9, 1990, Salutar and the University filed a patent application for the process. That application named as inventors Rocklage and both plaintiffs. In April of 1990, the University and Salutar submitted a grant application to California Department of Commerce for a CompTech grant under which Salutar sought to contribute $150,000 toward the research, and Salutar and the University asked the state to match that amount with a $150,000 grant. The University and Salutar executed an agreement entitled Memo of Understanding Under California Competitive Technology Program Grant Application (the "Research Funding Agreement"). The Research Funding Agreement designated Kucharczyk as the Principal Investigator for the University and Moseley as co-investigator. Kucharczyk signed the Research Funding Agreement. In 1990, CompTech provided $150,000 in research funds to UCSF.

Plaintiffs assigned their rights in the invention to the University in the Assignment Agreement they signed in early 1990.[3] Rocklage assigned his rights to Salutar, which in turn assigned its rights to the University on May 7, 1990. On June 13, 1990, Salutar and the University entered into their exclusive License Agreement ("License Agreement"). In accordance with the License, Salutar paid the University $12,500 upon executing the license and paid an additional $12,500 patent issued in March of 1993. The University paid plaintiffs 50% of each of those payments.

## III. SUMMARY JUDGMENT

Both parties have moved for summary judgment. Summary judgment is appropriate where no genuine issue exists as to any material fact and where the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the burden of establishing that there is no genuine issue of material fact. *Id.; Celotex*

---

**2.** Thus, the Court does not have before it either plaintiffs' civil rights claim or plaintiffs' claim for declaratory relief.

**3.** On September 18, 1992, plaintiffs executed a second assignment covering improvements to the invention.

*Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Generally, after the moving party makes a properly supported motion, the non-moving party has the burden of presenting specific facts showing that contradiction is possible. *British Airways Board v. Boeing Co.,* 585 F.2d 946, 950–52 (9th Cir.1978). It is not enough for the non-moving party to point to the mere allegations or denials contained in the pleadings. Instead, it must set forth, by affidavit or other admissible evidence, specific facts demonstrating the existence of an actual issue for trial. The evidence must be more than a mere "scintilla" of evidence; the non-moving party must show that the trier of fact could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Summary judgment may be granted "[i]f the evidence is merely colorable ... or is not significantly probative." *Eisenberg v. Insurance Co. of North America,* 815 F.2d 1285, 1288 (9th Cir.1987). In reviewing a motion for summary judgment, the Court must take the non-movant's evidence as true and all inferences are to be drawn in the light most favorable to the non-movant. *Id.* at 1289.

## IV. CONTRACTS

At issue in this case are several contracts: (1) the Patent Agreement between each of the plaintiffs and the University; (2) the Assignment Agreement between the plaintiffs and the University; (3) the CompTech Research Funding Agreement between the University and Salutar; and (4) the Licensing Agreement between the University and Salutar. Plaintiffs contend that the University was obligated by contract to obtain a reasonable running royalty upon licensing their invention. The Court's first task in this case is thus an analysis of the nature and content of the various contracts at issue here to determine whether they contain such an obligation as well as an analysis of the requirements of the Patent Policy, which plaintiffs argue obligates the University to obtain a reasonable royalty.

The Court first discusses the Patent Agreement and the Assignment Agreement. Though neither expressly requires the University to obtain a royalty, both of these documents refer to the University's Patent Policy. Plaintiffs contend that the Patent Policy applies to them as a matter of contract because it is incorporated by reference into the Patent and Assignment Agreements. They also contend that the Patent Policy requires a mandatory royalty. The Court agrees that the Patent Policy applies here, but for the reasons set forth in detail below, the Court finds that the Policy does not contain such an obligation. The Court also finds that neither the Research Funding Agreement nor the License Agreement contains a contract term requiring the University to obtain a royalty on the plaintiffs' invention.

### A. *Patent Agreement*

Upon joining the University faculty, each plaintiff executed a form Patent Agreement with the University requiring them to assign to the University all rights in any invention developed in the course of their employment. Plaintiff Moseley signed a 1980 version of the Patent Agreement on October 21, 1982. Plaintiff Kucharczyk signed a 1985 version Patent Agreement on December 30, 1987. The Patent Agreements are very similar, and the parties agree that the 1985 version of the Patent Agreement is applicable here.[4] For that reason, only the 1985 version will be described here.

The Patent Agreement is contained on a form contract bearing the title "University of California State Oath of Allegiance and Patent Agreement." The first page contains the State Oath of Allegiance and what will be referred to as the Patent Policy Statement. The Patent Policy Statement, which will be discussed in greater detail in Section IV.C.2, *infra,* bears the heading "University of California Patent Policy." The first page of agreement bears a notation on the bottom indicating "POLICY IS CONTINUED ...

---

4. The 1980 version differs only slightly. For instance, the Patent Policy is referred to as the "University Policy Regarding Patents" while the

1985 version refers to the "University of California Patent Policy."

Please sign Patent Agreement on reverse side." The Patent Policy Statement continues on the reverse side. The end of the Patent Policy Statement states that it was revised effective November 18, 1985. The reverse side also contains the Patent Agreement. The Patent Agreement states "Please read Patent Policy on reverse side and above."

The Patent Agreement states: "[b]y execution of this agreement, I understand that I am not waiving any rights to a percentage of royalty payments received by University, as set forth in University Patent Policy." It further states that it is made "in part consideration of my employment, and of wages and/or salary to be paid to me during any period of employment, by University, and/or my utilization of University research facilities and/or my receipt of gift, grant or contract research funds through the University." The Patent Agreement further requires each plaintiff to do all things necessary to assign the rights to the University. No express term in the Patent Policy requires the University to obtain a royalty.

### B. *Assignment Agreement*

The Assignment Agreement too makes reference to the Patent Policy. Following their invention, Kucharczyk and Moseley entered into an Assignment Agreement with the University whereby plaintiffs assigned all their rights in their process to the University. The Assignment Agreement recited that the assignment was made:

> in consideration of One Dollar ($1.00) and in consideration of the benefits stipulated in the "University of California Policy Regarding Patents", as revised and effective as of November 18, 1985, which document is made by reference part hereof, and in fulfillment of my Patent Agreement with the University of California.

The assignment Agreement itself does not contain any term requiring the University to obtain a royalty on an invention.

### C. *Patent Policy*

#### 1. *Contract Term*

■ The Court now turns to a discussion of the Patent Policy, which plaintiffs argue applies to them and requires the University to obtain a royalty on their invention. The Patent Policy itself is not an agreement between the parties. Instead, as a policy of the University, it has the force and effect of statute. *Regents of University of California v. City of Santa Monica*, 77 Cal.App.3d 130, 135, 143 Cal.Rptr. 276 (1978).[5] However, plaintiffs contend that the Patent Agreement and the Assignment Agreement incorporate by reference the Patent Policy and that the Patent Policy thereby became a term of these agreements.

■ "For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." *Williams Const. Co. v. Standard–Pacific Corp.*, 254 Cal.App.2d 442, 61 Cal.Rptr. 912 (1967). While the Patent Agreement does not expressly state that it is incorporating the Patent Policy by reference, it clearly and unequivocally refers to it, stating that execution of the agreement does not waive the signer's "rights to a percentage of royalty payments received by University, as set forth in University Patent Policy, hereinafter called 'Policy'" and making several other references to the Policy. The reference is called to the attention of both parties. Finally, the Patent Policy is easily available to the contracting parties given that it is printed on the reverse side of the Patent Agreement. The Court finds that the Patent Policy is thus incorporated by reference into the Patent Agreement. *See, Singer v. The Regents of the University of California*, No. 950381 (San Francisco Super.Ct. Mar. 1, 1996), slip op. at 8 (holding Patent Policy incorporated

---

**5.** Because the University is a state constitutional agency, Cal. Const. art. IX, § 9, "policies established by the Regents as matters of internal regulation may enjoy a status equivalent to that of

state statutes." *Regents v. City of Santa Monica*, 77 Cal.App.3d at 135, 143 Cal.Rptr. 276. (Citation omitted.)

by reference into Patent Agreement). The Patent Policy is likewise expressly incorporated by reference in the Assignment Agreement, which states that the assignment is made "in consideration of the benefits stipulated in the 'University of California Policy Regarding Patents', as revised and effective as of November 18, 1985, which document is made by reference part hereof." The Patent Policy thus is both an official policy of the University, with the force and effect of statute, *Regents v. Santa Monica*, 77 Cal.App.3d at 135, 143 Cal.Rptr. 276, and a contract term.

Having concluded that the Patent Policy was incorporated by reference into both the Patent Agreement and the Assignment Agreement, the Court now turns to an analysis of the Patent Policy, a subject of no small dispute. In brief, plaintiffs contend that the Patent Policy contains a requirement that all licenses bear reasonable royalties; the University contends that it does not. Both parties point to different documents in support of their positions. For the reasons set forth below, the Court finds that the Patent Policy does not require all licenses to be royalty-bearing.

#### 2. *Patent Policy Statement*

The University contends that the Patent Policy consists solely of the Patent Policy Statement, i.e., the words reproduced on the 1985 Patent Agreement in the section titled: "University of California Patent Policy." The Patent Policy Statement consists of three parts: (I) Preamble, (II) Statement of Policy, and (III) Patent Responsibilities and Administration. The Preamble states the purpose of the Patent Policy:

> It is the intent of the President of the University of California, in administering intellectual property rights for the public benefit, to encourage and assist members of the faculty, staff, and others associated with the University in the use of the patent system in a manner that is equitable to all parties involved.

---

**6.** The pagination of Exhibit 21 is somewhat ambiguous. The first several pages bear typewritten

The Preamble further states that the Patent Policy was adopted:

> To encourage the practical application of University research for the broad public benefit, to appraise and determine relative rights and equities of all parties concerned, to facilitate patent applications, licensing, equitable distribution of royalties, *if any*, to assist in obtaining funds for research, to provide for the use of invention-related income for the further support of research and education, and to provide a uniform procedure in patent matters when the University has a right or equity . . .

(Emphasis added.)

Sections A and B of the Statement of Policy provide that employees must promptly disclose and assign all inventions to the University. In Section C, the University "agrees, for and in consideration of said assignment of patent rights, to pay annually to the named inventor(s) . . . 50% of the net royalties and fees received by the University." The Patent Responsibilities and Administration portion of the Patent Policy Statement delegates duties to various the University personnel.

The Patent Policy Statement does not require the University to obtain a royalty on any invention, though it does impose on the University the obligation to share any royalty it does obtain with the inventor. The University thus argues that it has no duty, contractual or otherwise, to obtain a royalty on plaintiffs' invention. Plaintiffs contend that the Patent Policy Statement is not the complete Patent Policy, and that the complete Patent Policy does impose a royalty requirement on the University.

#### 3. *Exhibit 21*

In support of their argument that the Patent Policy is not limited to the Patent Statement, plaintiffs rely on Exhibit 21 of the Sponsored Programs Office ("SPO") Handbook. Exhibit 21 is the subject of vigorous dispute, and so is described in some detail. Exhibit 21 in the SPO Handbook is 12 typeset pages long, and each page bears the heading "Exhibit 21—Patent Policy."[6] The ex-

headers stating "Page 1 of 12," "Page 2 of 12," etc. Beginning on the sixth page, the pages bear

hibit consists of a number of documents. The first page is a memo dated September 1, 1987 from the University Provost for Research to various administrators at the University which discusses the University Patent Agreement. The memo states that "guidelines pertaining to the University of California Patent Agreement are set forth in the attachment." The next three pages consist of "Guidelines Concerning the Patent Agreement." These Guidelines are likewise dated September 1987. The next page is labeled Appendix B, and is a form Exemption to Signing Patent Agreement. The sixth page is a memo from the Vice Chancellor of Research to a number of University administrators.[7] The memo refers to "the attached University of California Patent Policy, dated November 18, 1985" and indicates that "there are no substantive changes in the new patent policy statement." The following four pages consist of the Patent Policy Statement.[8] The first of the four pages is labeled "University of California Patent Policy" and is dated November 18, 1985.[9] Following those four pages is a document labeled "Attachment, November 18, 1985" and titled "University of California Patent Policy: Administrative Statements Concerning University Patent Matters." That document is a one-page list of various statements which "are to be considered in effect until such time as each is specifically rescinded or superseded." The last page of Exhibit 21, which is the source of a great deal of dispute in this case, is a document titled: "University of California Summary of Sponsor Patent Rights Applicable to Funding Agreements with Industrial (For Profit) Sponsors of Research" ("Summary"). The bottom of the Summary bears the date March 1984. Plaintiffs contend that the Patent Policy consists of the final six pages of Exhibit 21, and that the obligations

they seek to enforce are contained in the Summary.

### 4. *Summary*

■ The Summary contains the language that plaintiffs contend impose a contractual duty to obtain royalties. The Summary, whose purpose is to provide "guidance on University of California patent rights policies to its potential industrial Sponsors of research," states that licenses to industry sponsors will:

a) be royalty-bearing, rates negotiable and based on general industry practices for the type of invention involved;

\* \* \* \* \* \*

c) normally require a license issue fee and appropriate minimum annual royalties.

Plaintiffs contend that the Summary is a part of the Patent Policy and has therefore been incorporated by reference into the Patent and Assignment Agreements, making the requirement of a royalty a term of their contracts with the University. They further argue that the University breached this term by entering into a Licensing Agreement with Salutar whereby Salutar was obligated to make only two lump-sum payments but was not required to pay a running royalty. The University argues that the Summary is not part of the Patent Policy, but is instead merely a summary of the "Guidelines For Patent Clauses In Agreements With For-Profit Sponsors" which is in turn contained in the University Contract and Grant Manual. The University contends that the Summary is not a part of any contract between it and the plaintiffs, and that it is therefore not liable for any failure to comply with its terms. The question of whether the Summary is part of the Patent Policy is thus crucial to the determination of this case.

---

the typewritten notation "Page 1 of 7," "Page 2 of 7," etc. In the SPO, the typewritten numbers have been crossed out, and "Page 6 of 12," "Page 7 of 12," etc. have been added.

**7.** This page is labeled Page 1 of 7, altered to "Page 6 of 12."

**8.** These four pages consist of precisely the same words as are contained in the Patent Policy Statement reprinted on the Patent Agreement.

**9.** The next three pages bear two page notations. At the very top, they bear the typewritten notation indicating "Page 3 of 7," etc., corrected to "Page 8 of 12," etc. Below that the pages bear the typewritten notation "Page 2 of 4," "Page 3 of 4," etc.

### a. *Legal Standard*

In order to analyze this case, the Court must determine the terms of the Patent Policy. The Patent Agreements signed by both plaintiffs contained the Patent Policy Statement. Both Patent Agreements directed the signatory to read the Patent Policy reprinted on the form agreement. Nothing in the Patent Policy Statement printed on that form indicates in any way that it is not the complete Patent Policy. The terms of the agreement would therefore appear to be limited to those printed on the form signed by each plaintiff. However, plaintiffs offer Exhibit 21 as extrinsic evidence supporting the finding that the Patent Policy and thus the contract contains a royalty requirement.

 Under California law, it is "a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." *Delucchi v. County of Santa Cruz,* 179 Cal.App.3d 814, 820, 225 Cal.Rptr. 43 (1986) (citation and quotation omitted). "The court must provisionally consider all credible evidence concerning the intention of the parties so that the court can place itself in the same situation in which the parties found themselves at the time they entered the agreement." *Id.* at 821, 225 Cal.Rptr. 43, citing *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage Co.,* 69 Cal.2d 33, 39–40, 69 Cal. Rptr. 561, 442 P.2d 641 (1968). In the final analysis, the evidence is admissible only if the court determines "that the contract is reasonably susceptible to the offered interpretation." *Delucchi,* 179 Cal.App.3d at 821, 225 Cal.Rptr. 43. If the evidence "tend[s] to prove a meaning of which the language [of the contract] is not reasonably susceptible, *Thomas Drayage,* 69 Cal.2d at 40 n. 7, 69 Cal.Rptr. 561, 442 P.2d 641, the court may then exclude the evidence." *Id.* "It is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence, even when conflicting inferences may be drawn from uncontroverted evidence." *Garcia v. Truck Ins. Exchange,* 36 Cal.3d 426, 435, 204 Cal.Rptr. 435, 682 P.2d 1100 (1984). If the credibility of the extrinsic evidence is not in question, then the question of whether contract is reasonably susceptible to the interpretation offered by the plaintiffs is a question of law for the court. *Id.; see also, Delucchi,* 179 Cal.App.3d at 821, 225 Cal. Rptr. 43. *See also, Okun v. Morton,* 203 Cal.App.3d 805, 816, 250 Cal.Rptr. 220 (1988) ("Although defendant and plaintiff dispute the inferences to be drawn from this evidence, the evidentiary facts themselves are not in substantial conflict. We therefore review the pertinent provisions of the contract in the context of the extrinsic evidence and make an independent determination of the meaning of the agreement.")

Here, the credibility of Exhibit 21 and the other extrinsic evidence supported by plaintiffs is not in dispute. Instead, the parties argue in favor of "conflicting inferences" which "may be drawn from uncontroverted evidence." *Garcia,* 36 Cal.3d at 435, 204 Cal.Rptr. 435, 682 P.2d 1100. This is thus a question for the Court. *Id.*

The Court finds that the evidence offered by plaintiff tends to prove a meaning of which the contract is not reasonably susceptible. An examination of the face of the Summary shows that it is not part of the Patent Policy. First, the title of the document shows that it is the summary of sponsor patent rights, not part of the Patent Policy. In addition, it states that "[t]his summary provides guidance on the University of California patent rights policies *to its potential industrial Sponsors of research.*" (Emphasis added.) Thus, the language of the Summary states that it is aimed at "potential industrial Sponsors," not employees. Moreover, unlike any other version of the Patent Policy Statement, the document provides an address and telephone number that the sponsors may use to contact the Patent, Trademark and Copyright Office. The face of the document thus indicates that it is not part of the Patent Policy.

In addition, the whole of Exhibit 21 does not support a finding that it is the Patent Policy. First, the SPO Handbook expressly states at page iv that it "is not intended to replace existing policies and procedures, but to point out those policies which may be applicable and those procedures which may need to be satisfied." Second, Exhibit 21

contains documents which are clearly not part of the Patent Policy, but are instead explanatory material, including the introductory memo, the Guidelines Concerning the Patent Agreement, a copy of an exemption form, and a memo from the Vice–Chancellor–Research regarding revisions to the Patent Policy. Plaintiffs do not contend that the entirety of Exhibit 21 constitutes the Patent Policy, but argue that it consists of the final six pages, which include the Patent Policy Statement, the administrative statements attachment, and the Summary. Plaintiff Kucharczyk contends that when he asked for the Patent Policy, he was sent these six pages, but does not otherwise explain why only the second half of Exhibit 21 should constitute the Patent Policy.

Thirdly, the December 6, 1985 letter from the Vice Chancellor of Research, which immediately precedes the Patent Policy Statement in Exhibit 21, suggests that the Summary is not part of the Patent Policy. That letter states that the Patent Policy dated November 18, 1995, supersedes the April 1, 1980 University Patent Policy, and indicates that the Patent Policy is attached. The letter further states that "[t]here are no substantive changes in the new policy statement." The Summary, which would constitute a substantive change from the 1980 Patent Policy if it were part of the Patent Policy, is dated March 1984. This indicates that the Summary is not a part of the. Patent Policy.

Finally, not only do several sections of the Guidelines suggest that the Patent Policy Statement is the entirety of the Patent Policy and that the Summary is a summary of a separate guideline, but also several attachments to the Guidelines suggest that the summary is not part of the Patent Policy. For instance, Section 11–220 of the Guidelines states:

> In November, 1985, the President issued the University of California Patent Policy, pursuant to his authority under Standing Order 100.4(gg). The policy includes: Section I, Preamble, an outline of the principles upon which the policy is based; Section II, Statement of Policy, which sets forth the requirement that employees and

certain others agree to assign inventions and patents to the University or other parties as appropriate, to promptly report and fully disclose potentially patentable inventions, and sets forth royalty-sharing provisions with the inventor and use of royalty income; and Section III, Patent Responsibilities and Administration, detailing ·responsibilities of the Intellectual Property Advisory Council charged by the Senior Vice President—Academic Affairs, and the assignment of responsibility for implementation of the policy to the Senior Vice President—Administration. Refer to Section 11–999 for full text of the University of California Patent Policy.

This precisely describes the Patent Policy Statement, and does not make any reference to the Summary. It therefore strongly suggests that the Patent Policy Statement is the Patent Policy. On the other hand, Section 11–341 of the Guidelines is titled *Summary of Sponsor Patent Rights Applicable to Funding Agreements With Industrial (For Profit) Sponsors of Research.* Like the Summary attached to Exhibit 21, it includes the categories established for commercial sponsors and contains the conditions that licenses be royalty-bearing. It also refers to 11–999 "for a full-text copy suitable for handout of the Summary of Sponsor Patent Rights Applicable to Funding Agreements With Industrial (For Profit) Sponsors of Research." This suggests that the Summary is distinct from the Patent Policy.

Section 11–999 lists a number of University References. A Patent Heading lists several documents, including:

—University of California Patent Policy

—Patent Agreement

—Summary of Sponsor Patent Rights Applicable to Funding Agreements with Industrial (For Sponsors of Research)

—Standing Order 100.4(gg) Duties of the President

—*Business and Finance Bulletin,* University of California Patent Program

—*Staff Personnel Manual,* Appendix B, University Patent Agreement.

The documents which follow include (among other documents not relevant here) the

three-part Patent Policy Statement; the Patent Agreement, which also includes the three-part Patent Policy Statement on its reverse; and the Summary. The Summary is separated from the Patent Policy Statement by the Patent Agreement. Both the language and the format of the Guidelines and its attachments thus demonstrate that the Patent Policy does not include the Summary.

Finally, the Summary does not help explain the Patent Policy, which states that its predominate purpose is to disseminate inventions to the public and further scholarly research. The purpose of the Summary, on the other hand, is to provide "guidance on University of California patent rights policies to its potential industrial Sponsors of research." The Summary does not, as plaintiffs argue, assist in interpreting the Patent Policy. Plaintiffs argue that the royalty requirement in the Summary must be used to interpret the Patent Policy in order to avoid destroying consideration flowing to the faculty inventors. *See, e.g., Singer,* slip op. at 5 n. 6. However, the Patent Agreement itself recites the inventor's consideration: "my employment, and ... wages and/or salary to be paid to me during any period of employment, by University, and/or my utilization of University research facilities and/or my receipt of gift, grant or contract research funds through the University." The Court finds that the contract does not provide for additional consideration in the form of a royalty.

" 'If the evidence offered would not persuade a reasonable man that the instrument meant anything other than the ordinary meaning of its words, it is useless.' " *Blumenfeld v. R.H. Macy & Co.,* 92 Cal.App.3d 38, 45, 154 Cal.Rptr. 652 (1979) (citation omitted). Here, the Court finds that a reasonable person viewing the Summary would not conclude that it was part of the Patent Policy. Because the evidence proffered by plaintiffs does not show that the Patent and Assignment Agreements are reasonably susceptible to the conclusion that the Summary is part of the Patent Policy. That evidence is therefore not admissible. The Patent and Assignment Agreements do not contain the Summary among their terms.

The Court finds that the Patent Policy Statement constitutes the entirety of the University Patent Policy. The Patent Policy does not include the Summary, upon which plaintiffs rely for the royalty requirement they seek to enforce. The Court holds that because the Patent Policy does not include the Summary or the royalty requirement imposed by the Summary, and because the Patent Policy explicitly limits its distribution to "royalties, if any," and because neither the Patent Agreement nor the Assignment Agreement explicitly require royalties by their terms, neither the Patent Agreement nor the Assignment Agreement requires the University to obtain a royalty on plaintiffs' invented process. However, the Court next turns to whether any other agreement between the parties makes binding either the Summary or a royalty requirement.

### D. *Research Funding Agreement*

■ On April 12, 1990, the University and Salutar entered into a Memo of Understanding under California Competitive Technology Program Grant Application regarding plaintiffs' research. The agreement states that it is "by and between SALUTAR, INC., ...' and The Regents of the University of California." Neither of the plaintiffs is a party to the agreement, although Kucharczyk is named as the Principal Investigator and Moseley was named, along with several others, as a co-investigator. Kucharczyk signed the agreement in his capacity as "Director, Neuroradiology Research, Research Program Principal Investigator." Because the plaintiffs are not parties to this agreement, the Court finds that the Research Funding Agreement does not confer any contract rights on them.

In addition, the agreement does not explicitly reference the Patent Policy or the Summary, nor does it require that any license be royalty-bearing. Nonetheless, plaintiffs argue that the Summary applies. Plaintiffs point to a two-page document entitled: "University of California 'Summary of Sponsor Patent Rights Applicable to Funding Agreements With Industrial (For Profit) Sponsors of Research For California Competitive Technology Program." ("CompTech Sum-

mary.") Plaintiffs argue that the CompTech Summary expressly requires that licenses must be issued in accordance with the Summary in cases of combined sponsor-CompTech funding. The second page of the two-page document is the Summary. As discussed *supra*, the Summary requires royalty-bearing licenses and "appropriate. minimum annual royalties."

Because the plaintiffs are not parties to the Research Funding Agreement, neither Summary is contractually binding on the University. However, the Court will discuss *infra* whether the CompTech Summary itself imposes any non-contractual obligation on the University.

### E. *License Agreement*

The Court next turns to the License Agreement between the University and Salutar to determine if it obligates the University to obtain royalty payments for the plaintiffs. On June 13, 1990, the University and Salutar entered into an exclusive License Agreement. The Agreement states that it is "by and between the REGENTS OF THE UNIVERSITY OF CALIFORNIA ... and SALUTAR, INC." Neither plaintiff is named as a party to the License Agreement. The License Agreement provides for a License Issue Fee in the amount of $25,000, half of which was to be paid upon execution of the Agreement, the other half of which was due if and only if the patent issued. The Agreement provided "[t]he license will be considered 'paid up' upon receipt of the total amounts due." The License Agreement does not provide for royalties, nor does it refer to the Summary. Thus, because neither plaintiff is a party to the Agreement and because there is no provision for royalties, the Court finds that the License Agreement does not confer any contractual right to royalties on the plaintiffs.

### F. *Implied Contract*

Plaintiffs also argue that they have an implied contract with the University which requires the University to obtain a royalty from any license to an industrial re-

search sponsor. They contend that this implied contract arose when they were given the Summary. However, terms that conflict with an express written contract cannot be implied in a written contract. *Tollefson v. Roman Catholic Bishop*, 219 Cal.App.3d 843, 855, 268 Cal.Rptr. 550 (1990). As *Tollefson* noted, "there simply cannot exist a valid express contract on one hand and an implied contract on the other, each embracing the identical subject but requiring different results and treatment." *Id.* Here, the Patent Agreement expressly provided for a division of. "royalties, if any" and did not impose a royalty requirement. Any such royalty *requirement* would be in conflict with the Patent Agreement. Accordingly, there is no implied contract to obtain royalties in this case.

Similarly, the covenant of good faith and fair dealing does not require royalties because such a requirement would be inconsistent with both the language and the intent of the Patent Policy. "The implied covenant is limited to assuring compliance with the express covenants or promises of the contract, and cannot be extended to create obligations not contemplated in the contract." *Los Angeles Equestrian Ctr., Inc. v. City of Los Angeles*, 17 Cal.App.4th 432, 447, 21 Cal.Rptr.2d 313 (1993) (citation omitted). Nor can the covenant be relied upon to impose obligations that are contradicted by the express terms of the agreement. *Carma Developers (California), Inc. v. Marathon Development California, Inc.*, 2 Cal.4th 342, 373, 6 Cal.Rptr.2d 467, 826 P.2d 710 (1992) (citation omitted). The Patent Policy imposes an obligation to share any royalties with an inventor, but expressly acknowledges the University's obligation to manage patents "for the broad public benefit." Because this obligation may conflict with a royalty requirement, such a requirement cannot be read into the Patent Policy.

The Court therefore finds as a matter of law that there is neither an express nor an implied contract between the parties obligating the University to obtain a running royalty for the plaintiffs.[10]

---

**10.** Plaintiffs allege that various other aspects of their contract have been breached. Specifically,

## V. RESCISSION

 Plaintiffs contend that if the contract does not contain a duty to obtain a royalty, then the contract should be rescinded for mistake of fact. California Civil Code § 1689(b) provides for unilateral rescission of a contract "[i]f the consent of the party rescinding ... was given by mistake." Plaintiffs allege that they were mistaken as to whether the contract required the University to procure royalties, and that this was a mistake of material fact. However, under California law, "[a] party is bound, even if he misunderstood the terms of a contract and actually had a different, undisclosed intention." *Blumenfeld,* 92 Cal.App.3d at 46, 154 Cal.Rptr. 652. The fact that plaintiffs were "simply mistaken" in their belief that the contract contained a royalty requirement does not serve to release them from their contract. Nonetheless, the Court need not determine whether plaintiffs' mistaken belief about what the terms of the contract were constitutes a mistake of fact that would justify rescission.[11] Instead, rescission of the plaintiffs' Assignment Agreement is precluded because Salutar has relied upon it. "[W]here the rights of others have intervened and circumstances have so far changed that rescission may not be decreed without injury to those parties and their rights, rescission will be denied and the complaining party left to his other remedies." *Angle v. U.S. Fidelity & Guar. Co.,* 201 Cal.App.2d 758, 763, 20 Cal.Rptr. 391 (1962), quoting *Beckwith v. Sheldon,* 165 Cal. 319, 324, 131 P. 1049 (1913). In *Angle,* the court held that "there can be no rescission where the rights of third parties would be prejudiced." *Id.* at 763, 20 Cal.Rptr. 391. Here, the rights of Salutar and its sublicensees would be preju-

diced by any rescission, making it unavailable.

## VI. STANDARD OF REVIEW

Having determined the nature of the contracts at issue here, the Court now turns to whether the University has violated any legal duty with respect to those contracts.

 The parties disagree on the standard of review to be applied to this case. Plaintiffs contend that the ordinary law of contract applies. However, in its opposition to plaintiffs' motion for summary adjudication, the University argues that the Court should apply the more deferential mandamus standard of review under which the plaintiffs must show that its actions were arbitrary, capricious, or entirely lacking in evidentiary support. This dispute has been extensively briefed.

The applicable standard of review depends on precisely which of the University's actions plaintiffs are complaining of. Plaintiffs are complaining that the failure to obtain royalties breached their Patent Agreements and Assignment Agreements. However, as set forth above, neither of these contracts with the University included a requirement that the University obtain royalties. Since neither contract contains the term which plaintiffs claim obligates the University to obtain a reasonable royalty rate, it is irrelevant to the royalty question whether these contracts are reviewed under the breach of contract standard or the mandamus standard. Plaintiffs have no contractual cause of action in which they might claim that the University has breached any obligation to obtain royalties.

---

plaintiffs allege that the University had a duty to conduct an inventorship audit to determine the proper inventors of the '744 patent, to obtain facts regarding sponsorship and to gather information regarding the value of the invention, and that the University failed to perform its duty. In light of the Court's decision with respect to plaintiffs' main claim that the University was required to obtain a running royalty, along with the Court's certification of that issue, the Court will reserve full consideration of these questions for another day. The Court will hold a status conference in this case on December 9, 1996 at 8:45 a.m. and at that time will discuss the resolution

of these and all other remaining issues in the case.

11. The Court notes that in order to demonstrate unilateral mistake, plaintiffs must show that the "unilateral mistake is known to the other contracting party and is encouraged or fostered by that party." *Bunnett v. Regents of University of California,* 35 Cal.App.4th 843, 855, 41 Cal. Rptr.2d 567 (1995). In *Bunnett,* the plaintiff was unable to prevail on his rescission claim because he "submitted no evidence that defendant knew about his mistake and encouraged or fostered the mistake." *Id.*

**1434**

Although the Research Funding Agreement does impose the terms of the Summary on the University, plaintiffs are not parties to that Agreement and therefore cannot complain of its breach.[12] Finally, plaintiffs are not parties to the Licensing Agreement, a contract between the University and Salutar. However, it is this Agreement which plaintiffs are actually challenging. Plaintiffs are complaining that the University acted wrongfully when it entered into a License Agreement that failed to provide for royalties. Thus, the Court must determine the standard of review applicable to this decision. In this, the Court's task is "to predict what the state supreme court would decide." *United States v. Mendoza–Acuna,* 764 F.2d 699, 701 (9th Cir.1985); *Amfac Mortg. Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d 426, 434–35 (9th Cir.1978). For the reasons set forth below, the Court determines that under California law, it must apply the arbitrary and capricious standard of review to the University's decision to enter into the Licensing Agreement with Salutar.

A. *Applicability of Mandamus to Licensing Agreement*

As an initial matter, plaintiffs are not complaining that the University breached the Licensing Agreement, nor are they parties to the Licensing Agreement. Therefore, breach of contract standards are irrelevant to their challenge to the University's decision to enter into the Licensing Agreement. Instead, the Court must determine what standard of review applies to the University's decision to enter into the Licensing Agreement with Salutar. For the reasons explained *infra,* the Court finds that ordinary mandamus applies.

In California, the "proper method of obtaining judicial review of most public agency decisions is by instituting a proceeding for a writ of mandate." *Bunnett,* 35 Cal.App.4th at 848, 41 Cal.Rptr.2d 567 (citing *Bodinson Mfg. Co. v. California Employ. Comm.,* 17 Cal.2d 321, 328–30, 109 P.2d 935 (1941)). *See also,* 8 B. Witkin, *California Procedure,* Extraordinary Writs § 4 (3d ed. 1985) ("In California, mandamus has an extremely varied use. It is an extraordinary writ to compel the performance of ministerial duty, and by reason of an innovation in practice, is also a proceeding to review decisions of statewide administrative agencies.") Both ordinary and administrative mandamus may apply to state actions, *see* Cal.Code Civ.Proc. §§ 1085, 1094.5. The type of mandate is determined by the nature of the administrative decision being challenged. *Tielsch v. City of Anaheim,* 160 Cal.App.3d 570, 574, 206 Cal.Rptr. 738 (1984). Decisions of a state agency "may be legislative, administrative, or judicial." *Quinchard v. Board of Trustees,* 113 Cal. 664, 669, 45 P. 856 (1896). Ordinary mandate applies to quasi-legislative acts, while quasi-judicial acts are reviewed by administrative mandate. *Western States Petroleum Ass'n v. Superior Court,* 9 Cal.4th 559, 566–67, 38 Cal.Rptr.2d 139, 888 P.2d 1268 (1995).

Plaintiffs contend that mandamus does not apply at all in this action, which they characterize as a breach of contract action. However, the plaintiff's characterization of his cause of action is not determinative. For example, in *Bunnett,* plaintiff filed his challenge to the University's decision to deny his request to participate in a particular retirement plan as a breach of contract claim. The court found his causes of action were "no more than challenges to the administrative decision of a state agency" and therefore subject only to a writ of mandate. *Bunnett,* 35 Cal.App.4th at 848, 41 Cal.Rptr.2d 567. *See also, Le Strange v. City of Berkeley,* 210 Cal.App.2d 313, 320, 26 Cal.Rptr. 550 (1962) (treating a civil action for declaratory relief as a petition for mandamus after noting that the appropriate method of reviewing the decisions or orders of administrative agencies, whether involving judicial functions or not, is by mandamus). Instead of relying on plaintiff's representation of his causes of action, a court must determine whether the challenged decision is a quasi-legislative one, or a quasi-adjudicatory one. *Bunnett,* 35 Cal.App.4th at 848, 41 Cal.Rptr.2d 567.

12. Although plaintiffs cannot complain about any alleged breach of the Research Funding Agreement, the Court will nonetheless determine whether plaintiffs have any rights flowing from the Research Funding Agreement.

In addressing this question, both parties take some comfort in the unpublished decision of the San Francisco Superior Court in *Singer v. The Regents of the University of California*, No. 950381 (San Francisco Super.Ct. Mar. 1, 1996). In that case, two professors formerly employed by the University filed a consolidated action alleging that the University breached their employment contracts with respect to four MRI-related patents developed by plaintiffs. Faced with issues similar (though not identical) to those presented here, the *Singer* court bifurcated the trial, holding that certain of plaintiffs' claims were contract claims to be tried before a jury, and while others were mandamus claims to be determined by the court. The *Singer* court held that plaintiffs' claims that the University failed to license third parties with respect to the plaintiffs' inventions, failed to license patent infringers, failed to mark patented devices, and changed the calculation of royalty payments were "not based on contract but involve discretionary action by the University." *Singer*, slip op. at 2 n. 2. The court held that these claims were subject to mandamus review to determine whether they were arbitrary and capricious. The *Singer* court also held that the reasonableness of the royalty rate obtained by the University in that case "is *not* at issue in [the] trial. The University's negotiation of a .56% royalty rate is a matter within the University's discretion, and may not be challenged in [a] jury trial." *Id.* at 6. n. 9 (emphasis in original). However, the *Singer* court found that plaintiffs' claim "that, by mischaracterizing 'royalty revenues' as 'research funds,' the University deprived them of contractually required royalties earned by the technology they invented" was a matter for a jury. The *Singer* jury found in favor of plaintiffs.

Plaintiffs argue that because in *Singer*, the issue of whether the University deprived the *Singer* plaintiffs of contractually required royalties was a question of fact for the jury, their claims are contract claims as well. The University argues that because the *Singer* court held that the royalty rate was a question for mandamus review, mandamus applies. The *Singer* court does not reconcile the conflict between these two holdings. On the one hand, the Court held that the royalty rate is within the discretion of the University and subject to mandamus review. On the other hand, it held that the question of whether the University should have received a higher royalty rate rather than research funding payments was a breach of contract question. This claim is essentially a claim that the royalty rate should have been higher. These two holdings thus conflict. Nonetheless, the Court has already found that the Patent Policy does not require a royalty as a matter of contract, and therefore turns to whether mandamus applies.

Plaintiffs first argue that because there was no adjudicatory decision by the University, and no administrative record, mandamus does not apply. In *Singer*, the court found that neither the Research Funding Agreement nor the License Agreement was quasi-legislative. The *Singer* court also found that the decisions lacked "indicia of 'judicial-ness,'" *id.* at 14, and they were therefore not quasi-adjudicative.

This Court finds, however, that the decision to enter into both of these agreements is quasi-legislative. "The distinction between the quasi-legislative and quasi-judicial decision contemplates the function performed rather than the area of performance." *Joint Council of Interns and Residents v. Board of Supervisors*, 210 Cal.App.3d 1202, 1210, 258 Cal.Rptr. 762 (1989). "Generally speaking, a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory action involves the actual application of such a rule to a specific set of existing facts." *Strumsky v. San Diego County Employees Retirement Ass'n*, 11 Cal.3d 28, 35 n. 2, 112 Cal.Rptr. 805, 520 P.2d 29 (1974). *See also, Bunnett*, 35 Cal.App.4th at 848 n. 3, 41 Cal.Rptr.2d 567. California courts have noted that "the distinction between legislative and adjudicatory determinations is anything but clear." *Joint Council of Interns*, 210 Cal.App.3d at 1209, 258 Cal. Rptr. 762. However, "legislative action is based upon facts which help the tribunal determine the content of law and of policy and help the tribunal to exercise its judgment or discretion in determining what course of action to take while adjudicative

decisions generally rest on facts concerning the immediate parties—who did what, where, when, how, and with what motive or intent." *Id.* at 1209–10, 258 Cal.Rptr. 762 (quotation and citation omitted).

While generally a quasi-legislative act is one in which the agency formulates a rule to be applied to all future cases, and an adjudicatory act is one in which a rule is applied to a specific set of existing facts, *Strumsky,* 11 Cal.3d at 35 n. 2, 112 Cal.Rptr. 805, 520 P.2d 29, in California, "[i]t has long been established that 'the award of a contract, and all of the acts leading up to the award, are legislative in character.'" *Joint Council of Interns,* 210 Cal.App.3d at 1211, 258 Cal.Rptr. 762, quoting *Santa Ana Tustin Community Hospital v. Board of Supervisors,* 127 Cal. App.3d 644, 652, 179 Cal.Rptr. 620 (1982). Here, the License Agreement was a contract between the University and Salutar. As the *Joint Council of Interns* court noted, "[t]his is so because the letting of contracts by a governmental entity necessarily requires an exercise of discretion guided by considerations of the public welfare." *Joint Council,* 210 Cal.App.3d at 1211, 258 Cal.Rptr. 762. The importance of "considerations of public welfare" is explicitly recognized in the Preamble to the Patent Policy, which states "[t]he University recognizes the need for and desirability of encouraging the broad utilization of the results of University research ... for the general public benefit" and which expressly states that the purpose of the Patent Policy is "[t]o encourage the practical application of University research for the broad public benefit."

■ This Court agrees with both plaintiffs and the *Singer* court in finding that the decision did not have the features of an adjudicative decision. "An adjudicative function implies an adversary proceeding between contending parties who are entitled to proffer evidence for review by an impartial trier of fact." *Joint Council of Interns,* 210 Cal. App.3d at 1210, 258 Cal.Rptr. 762. For instance, in *Bunnett,* the court held that the University's decision to deny plaintiff's application to enroll in a retirement plan was "unquestionably an adjudicatory act." *Bunnett,* 35 Cal.App.4th at 848 n. 3, 41 Cal.

Rptr.2d 567. Here, the acts surrounding the License Agreement were not an adversary proceeding, nor were there contending parties. *See, e.g., Singer,* Slip Op. at 14–16 (finding that Research Funding and Licensing Agreements lacked indicia of "judicialness"). However, the determination that the decision was not quasi-adjudicatory does not automatically mean, as plaintiffs appear to argue, that mandamus does not apply. Instead, mandamus applies to quasi-legislative actions as well. The absence of an adjudicatory or quasi-adjudicatory decision does not mean that mandamus does not apply, but simply affects the type of mandamus review. *See, e.g., Joint Council of Interns,* 210 Cal. App.3d at 1210, 258 Cal.Rptr. 762. Similarly, the absence of a formal administrative record is not determinative. A formal administrative record is not required. "[T]he record of informal agency action is often poorly organized; it may be a couple of files, a memo, or a cardboard box into which various documents have been tossed." Michael Asimow, *The Scope of Judicial Review of Decisions of California Administrative Agencies,* 42 UCLA L.Rev. 1157, 1227 (1995). Instead of focusing on whether there is a formal record or not, the Court must look to the type of decision at issue to determine the kind of review to apply.

■ Plaintiffs also argue that mandamus is not available in contract actions, relying on *Wenzler v. Municipal Court,* 235 Cal.App.2d 128, 45 Cal.Rptr. 54 (1965), or when the amount sought is disputed or unliquidated, citing *City of Los Angeles v. Rounsavelle,* 15 Cal.App.2d 750, 59 P.2d 1075 (1936). In *Wenzler,* the plaintiff sought mandamus to compel the Municipal Court to return exhibits and disgorge a fine to him. The court denied the writ on the grounds that the fine and penalty had been deposited with the county treasurer, and plaintiff had not alleged that the exhibits remained in the Municipal Court's custody. In dicta, the *Wenzler* court noted that

As a general proposition, mandamus is not an appropriate remedy for enforcing a contractual obligation against a public entity for at least two reasons. The first is that contracts are ordinarily enforceable by civ-

il actions, and the writ of mandamus is not available unless the remedy by civil action is inadequate. The other is that the duty which the writ of mandamus enforces is not the contractual duty of the entity, but the official duty of the respondent.

*Wenzler,* 235 Cal.App.2d at 132, 45 Cal.Rptr. 54 (citations omitted). Here, the License Agreement does not confer any contractual duties on the University. In addition, there is no civil remedy adequate to address the University's decision in contracting with Salutar. Moreover, as *Wenzler* itself explains, the rules regarding mandamus are relaxed in cases concerning

> disputes as to the proper construction of a statute or ordinance defining or giving rise to the exercise of official duty, and, although recognizing that the ultimate effect of a decision may be to adjudicate a money claim, they emphasize the necessity of official cooperation and the ministerial nature of the official acts involved.

*Id.,* citing *Tevis v. City and County of San Francisco,* 43 Cal.2d 190, 198, 272 P.2d 757 (1954). In *Tevis,* for instance, the court addressed a mandamus action seeking to compel city officials to allow employees vacation pay. *See also, Coan v. California,* 11 Cal.3d 286, 113 Cal.Rptr. 187, 520 P.2d 1003 (1974). Although the *Rounsavelle* court found that the remedy of mandamus "is not available to enforce the payment of a claim unliquidated and indefinite in amount," *Rounsavelle,* 15 Cal.App.2d at 752, 59 P.2d 1075, in a case in which petitioner sought to compel officers of the Los Angeles Board of Education to reimburse him for money expended in connection with several elections. The appellate court denied the writ because it held that mandamus only applied when the claim was liquidated or capable of exact determination. *Id.* However, the California Supreme Court noted "[a]lthough a claim for payment of salary

is in effect a money claim, mandamus is a proper remedy where the dispute concerns the proper construction of a statute or ordinance giving rise to the official duty to pay the salary claim." *Coan,* 11 Cal.3d at 291, 113 Cal.Rptr. 187, 520 P.2d 1003.

Here, plaintiffs are asking the Court to define the University's official duties under its Patent Policy and to review its decision to enter into a Licensing Agreement with Salutar. They are thus asking the Court to review a state agency decision. This is the essence of mandamus. Public agency decisions are reviewed under a mandamus standard. As the *Bunnett* court held, when a plaintiff states "no more than challenges to the administrative decision of a state agency," *Bunnett,* 35 Cal.App.4th at 848, 41 Cal.Rptr.2d 567, mandamus applies. Further, although if the plaintiffs prevail, they may obtain money damages, the nature of the decision being reviewed, rather than the nature of any potential damages, determines the standard of review. *Tielsch,* 160 Cal.App.3d at 574, 206 Cal.Rptr. 738.[13]

The Court finds that because the decision in this case was the entering into a contract which expressly involved balancing of a number of interests, including the public interest, it was a quasi-legislative action and therefore mandamus applies.

### B. *Nature of Review of Licensing Agreement*

Having determined that mandamus applies, and that the University's decision to enter into the Licensing Agreement was quasi-legislative, the Court must determine whether that decision should be reviewed by ordinary mandamus or by administrative mandamus, and whether it should be reviewed pursuant to an open record or a closed record.

**13.** Plaintiffs also cite *United States v. Winstar Corp.,* — U.S. ——, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) for the proposition that mandamus should not apply here. However, in that case the Supreme Court applied federal law to determine that a federal agency can be bound by its contracts, finding that neither the federal sovereign act doctrine nor the legal impossibility doctrine applied to the government's legislative efforts to avoid its contract responsibility. *Winstar* does not apply California law or the law of mandate, and therefore does not apply. Additionally, plaintiffs in this action do not have any contract with the University which would obligate it to procure running royalties. Therefore, regardless of whether or not *Winstar* affects California contract law, a question the Court does not address here, the law of contract does not apply to plaintiffs' claim for a running royalty.

### 1. Ordinary vs. Administrative Mandamus

■ In ordinary mandate, the reviewing court's "inquiry is. limited to whether the decision was arbitrary, capricious, or entirely lacking in evidentiary support." *Bunnett*, 35 Cal.App.4th at 849, 41 Cal.Rptr.2d 567. In administrative mandate, the reviewing court must determine whether substantial evidence supports the decision. *Id.* Ordinary mandate applies to quasi-legislative decisions, while administrative mandate applies to quasi-adjudicative decisions. *Id.* Here, because the University's decision to enter into the Licensing Agreement was quasi-legislative, ordinary mandate applies and the Court must therefore determine whether the decision was arbitrary, capricious, or entirely lacking in evidentiary support.[14]

■ The question of whether an agency's decision was arbitrary or capricious is a question of law. *Shapell Indus., Inc. v. Governing Board*, 1 Cal.App.4th 218, 233, 1 Cal.Rptr.2d 818 (1991). Therefore, the Court must determine as a matter of law whether the University's decision to enter into the Licensing Agreement was arbitrary, capricious, or entirely lacking in evidentiary support. The Court will also determine whether plaintiffs have any rights based on the University's alleged failure to obtain a running royalty in accordance with the terms of the CompTech Summary applicable to the Research Funding Agreement.

### 2. Open vs. Closed Record

Having determined that ordinary mandamus applies, the Court next determines that the decision should be reviewed on a closed record. In *Western States Petroleum Assn v. Superior Court*, 9 Cal.4th 559, 576, 38 Cal.Rptr.2d 139, 888 P.2d 1268 (1995), the California Supreme Court permitted open records in "traditional mandamus actions challenging ministerial or informal administrative actions if the facts are in dispute." However, it held that "extra-record evidence is generally not admissible in traditional mandamus actions challenging quasi-legislative administrative decisions." *Id. Western States* did hold that there were was an exception to this rule when the evidence sought to be admitted could not be produced at the administrative level "in the exercise of reasonable diligence." *Id.* at 578, 38 Cal.Rptr.2d 139, 888 P.2d 1268. But this exception is quite limited:

> Extra-record evidence is admissible only in those rare instances in which (1) the evidence in question existed *before* the agency made its decision, and (2) it was not possible in the exercise of reasonable diligence to present this evidence to the agency *before* the decision was made so that it could be considered and included in the administrative record.

*Id.* (Emphasis in original.) Because these conditions have not been met with respect to any extra-record evidence proposed by either party, the Court will consider only a closed record and will not consider any extra-record evidence. The Court will undertake that review in Section VII, *infra.*

## VII. MANDAMUS REVIEW

■ The Court now turns to a review of the University's decision to enter into the License Agreement with Salutar. The License Agreement provided Salutar with an exclusive license for the process. Salutar agreed to pay the University $12,500 upon execution of the License and an additional $12,500 upon receiving a notice of allowance from the patent application, but the License Agreement provides for no other payments. The Court must determine whether that decision to enter into the License Agreement was arbitrary and capricious.

■ In reviewing the agency decision under this standard, the court "must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the en-

---

**14.** However, the Court notes that "ordinary mandate is used to review adjudicatory actions or decisions when the agency was not required to hold an evidentiary hearing." *Bunnett*, 35 Cal. App.4th at 848, 41 Cal.Rptr.2d 567. Thus, ordinary mandate would apply to this case even if the decision were adjudicatory rather than legislative because the University was not required to hold an evidentiary hearing in this matter.

abling statute." *California Hotel & Motel Assn. v. Industrial Welfare Comm.*, 25 Cal.3d 200, 213, 157 Cal.Rptr. 840, 599 P.2d 31 (1979). Nonetheless, the Court may not substitute its judgment for that of the University on questions of fact. *Id.* at n. 30.

### A. *Applicable Policies*

A number of University documents address the University's obligations, including the Patent Policy, the Summary and the CompTech Summary, and the Guidelines on University–Industry Relations, which are contained in Exhibit 22 to the SPO Handbook.

The Patent Policy obligates the University to use the patent system "in a manner that is equitable to all the parties involved." Patent Policy at § I. The Patent Policy also provides that it is designed, *inter alia* "to appraise and determine relative rights and equities of all parties concerned, to facilitate patent applications, licensing, equitable distribution of royalties, if any." *Id.* It makes the Senior Vice President–Administration responsible for evaluating the invention and the applicable patent rights, negotiating licenses, and collecting and distributing royalties.

As has been stated repeatedly, the Summary provides that all licenses must be "royalty-bearing, rates negotiable and based on general industry practice for the type of invention involved" and "normally require a license issue fee and appropriate minimum annual royalties." The Summary further provides that an industry sponsor is entitled to an exclusive license only "[w]hen the Sponsor pays all direct and indirect costs ... for the research to be undertaken." A Sponsor paying "less than all direct or indirect costs in the form of money, expendable materials or supplies, or other substantial assistance" is entitled only to a non-exclusive license. The CompTech Summary provides that when there is only one Private Sector Participant of a CompTech project, it will normally be granted exclusive rights. When there is more than one Private Sector Participant, they will be granted nonexclusive rights.

Guideline 8 of the University Guidelines on University–Industry Relations, which relates to "University Practice on Licensing the Use of Technology Resulting from Research," and is set forth in Exhibit 22 to the SPO, provides that "[a]ny license of a patentable invention must `at least provide for diligent development by the licensee and, *in most cases,* for the payment of royalties." (Emphasis added.) The Court reviews the University's decision to determine whether it was arbitrary and capricious with respect to these policy provisions.

### B. *The University's Decision*

Plaintiffs made their discovery on February 13, 1989. On February 23, 1990, Kucharczyk faxed a Disclosure and Record of Invention Form to the University. In that form, Kucharczyk and Moseley stated that Kucharczyk and David Norman had discovered "Magnetic Susceptibility Contrast Magnetic Resonance Imaging of Cerebral Ischemia: Quantitative and Temporal Mapping of Perfusion Deficits." They further stated that Salutar was the sole funding source, and that Salutar was the only company they believed would be interested in licensing the process.

The University immediately began negotiating with Salutar. The University sent a Letter of Intent, set to expire on June 1, 1990, to Salutar indicating its agreement to negotiate exclusively with Salutar for a license agreement for the invention. Negotiation on behalf of the University was mainly conducted by Beatrice Bryan, a Licensing Associate with the University Patent, Technology and Copyright Office. Dr. Alan Watson negotiated on behalf of Salutar.

Beginning in late February, and over the next several months, the University and Salutar attempted to work out a licensing agreement. The administrative record demonstrates that several concerns were at issue. From the beginning Salutar was unwilling to pay a royalty because they owned the patent to the compound used in the plaintiff's method. In addition, because Rocklage was named as an inventor, Salutar had a proprietary interest in the invention. Salutar was also initially only willing to pay a very small licensing fee in the range of $1,000 to $5,000. Also at issue was the desire of both the

University and the plaintiffs to continue a research relationship with Salutar. Finally, the commercial development appears to have been limited by the fact that Salutar was the only company interested in licensing a method of use for one of its patented compounds. It appears that there were not other interested bidders or potential bidders.

On March 9, 1990, approximately one week into the negotiations, the parties agreed to an exclusive royalty-free license. They also agreed that Salutar would pay a license fee, which would be the subject of further negotiations. Additionally, they agreed to a cap of $25,000 on the license fee. After several more months of negotiation, during which the Letter of Intent was extended, the University and Salutar finally agreed on a $25,000 license fee, with half to be paid immediately and the remaining half due only if the patent issued. The decision to enter into the License Agreement was approved by Carl Wooten, Director of Patent, Trademark and Copyright Office. The Licensing Agreement was signed on June 13, 1990.

The patent application was filed by Salutar's British patent counsel, Julian Cockbain, and Lyon & Lyon, Salutar's local counsel. The University retained Kate Murashige, Esq., of Irell & Manella, to represent the University's interests in the patent application process. The patent application was filed and the patent eventually issued in March of 1993.

Plaintiffs argue that the decision to enter into the License Agreement on those terms was arbitrary and capricious for several reasons. Plaintiffs contend that the University failed to fulfill the requirement imposed by the Patent Policy that it evaluate the patent and determined the rights and equities of the parties. They contend that they made no effort to determine inventorship until after the dispute arose, and that Rocklage was erroneously designated as an inventor. They also contend that the University failed to monitor the patent application process. Plaintiffs additionally argue that the University failed to determine the commercial value of the process. They contend that the University knew the process was actually worth over $200 million, but arbitrarily and capri-

ciously failed to take that into account in negotiating the license. Plaintiffs next argue that the University failed to act in accordance with its own policies when it allegedly failed to determine whether Salutar was the sole source of funding. Plaintiffs also argue that the University failed to take into account their interests, and failed to evaluate industry standards in entering into the License Agreement.

### 1. *Rocklage As Inventor*

Although the University has not moved for summary judgment on the issue of whether Rocklage was an inventor, the Court nonetheless addresses the issue of whether the University was arbitrary and capricious in entering into the License with the understanding that Rocklage was a co-inventor.

The administrative record supports the finding that the University was neither arbitrary nor capricious with respect to Rocklage's inventorship. From the beginning, plaintiffs informed the University that Rocklage was a co-inventor. In the Disclosure and Record of Invention form sent to the University on February 23, 1990, plaintiffs stated that the invention was orally disclosed to Dr. Scott Rocklage, Vice-President of Salutar on February 13, 1989, the day it was conceived. Both Kucharczyk and Moseley signed the form, a draft of which had been faxed to Rocklage and Watson at Salutar before it was sent to the University. Furthermore, in a letter dated February 23, 1990 from Watson to Cockbain, Salutar's patent attorney in London, Watson states: "Kucharczyk feels strongly both Moseley and Rocklage are inventors." Additionally, the University acknowledged receipt of the disclosure of invention in a letter dated February 27, 1990 addressed to Kucharczyk, Moseley and Rocklage. The letter began: "Dear Inventors." Nothing in the administrative record indicates that either plaintiff objected to the University addressing Rocklage as an inventor. Even further, Murashige sent a copy of the patent application to both plaintiffs asking them to review and sign it. The patent application states that Rocklage is the first inventor of their process. Although plaintiffs now contend that Rocklage was not

an inventor, nothing in the administrative record shows that plaintiffs, or anyone else, ever questioned Rocklage's inventorship. Indeed, though the plaintiffs were well aware that the University was treating Rocklage as an inventor, and plaintiffs were familiar with their invention and its genesis, they never challenged that treatment. The Court therefore finds that the University did not act arbitrarily or capriciously in allowing Rocklage to be named as an inventor.

### 2. *Exclusive License*

Plaintiffs contend that the University acted arbitrarily and capriciously in granting Salutar an exclusive license, arguing that Salutar was not the sole funding source and that Syntex was also a sponsor of the research. Plaintiffs contend that the University thereby violated the Patent Policy and the CompTech Summary, which provides that the University may grant an exclusive license only to sole funding providers. The Court finds that the University did not act arbitrarily or capriciously in granting Salutar an exclusive license.

While plaintiffs now argue that Syntex was an important sponsor of their invention, at the time they disclosed their invention they informed the University that Salutar was the only industrial sponsor. The Disclosure Form stated that Salutar was both the sole source of funding and the only company they believed might be interested in "using, developing or marketing this invention." Additionally, Syntex had expressly "relinquishe[d] its right of first refusal for the University's rights to any patentable New Inventions" from plaintiffs' research in a Letter Agreement dated December 15, 1989.[15]

The Court finds that based upon the information provided it by the plaintiffs, and upon Syntex's relinquishing of its rights, the University did not act arbitrarily and capriciously in treating Salutar as a sole funding source. Furthermore, pursuant to the CompTech Summary, a private sponsor which has received a CompTech grant is treated as a sole sponsor. As such, it is

entitled to an exclusive license. The Court therefore finds that the University did not act arbitrarily and capriciously in granting Salutar an exclusive license.

### 3. *Royalty*

The Summary obligates the University to obtain a royalty-bearing license with rates negotiable and based on general industry practices for the type of invention involved. The Summary also provides that licenses should "normally require a license issue fee and appropriate minimum annual royalties." Plaintiffs argue that the University did not comply with the Summary, as it was obligated to do by the Research Funding Agreement.

The University argues that the $25,000 licensing fee should be considered a royalty. The University cites a 1994 University Bulletin which defines a royalty as "consideration paid by a licensee to a licensor for the right to make, use or sell an invention." However, the probative value of this Bulletin is not great, given that it is dated well after the events at issue here. The University also cites *Eastman Oil Well Survey v. Lane–Wells Co.,* 21 Cal.2d 872, 136 P.2d 564 (1943). In that case, the California Supreme Court noted that "[t]he term royalty ordinarily envisages a duty to make and a corresponding right to receive payments proportionate to the use of patented methods or machines." *Id.* at 873, 136 P.2d 564. In that case, the royalty at issue was due only when the plaintiff used defendant's oil drilling methods, and was thus proportionate to the use of the protected method. In *Hazeltine Corp. v. Zenith Radio Corp.,* 100 F.2d 10 (7th Cir. 1938), the court considered whether an annual lump sum payment was a royalty. The *Hazeltine* court held that " '[r]oyalty,' when used in connection with a license under a patent, means the compensation paid by the licensee to the licensor for the use of the licensor's patented invention." *Id.* at 16 (footnote omitted). The court found that "a provision in a patent-license contract which provides for the payment of a fixed sum of

**15.** The University and Syntex applied for a CompTech grant. When the grant application was denied, Syntex agreed to fund certain research, but expressly relinquished its patent rights.

money per fixed period of time for the use of a patented invention states a 'rate of royalty' within the generally understood and recognized meaning of that phrase." *Id.*

Plaintiffs argue that these cases are distinguishable because these cases involve the payment of money for use over time. In addition, the administrative record suggests that at the time, the University did not consider the payments to be a typical royalty. In a memo to the file dated February 26, 1990, Bryan wrote that she told Kucharczyk "it would be difficult to get a royalty." [16] Further, in a letter dated March 7 from Bryan to Watson, the University agreed that "[t]he license agreement will not include a running royalty based on the sale of your present and future products." In a March 7, 1990 letter to Watson, Salutar's parent company, Hafslund Nycomed indicated that it was "happy to hear that University of California has accepted to grant us an exclusive royalty-free license on the use of the technology covered by any valid claim.... (This means that the University of California will not have any royalty in the invention)." In a letter dated April 19, 1990, Bryan stated: "Because the University normally charges a minimum annual royalty, as well as a royalty on sales, the lack thereof in this license gives us cause for concern in the diligence provisions."

Nonetheless, the record also shows that the University treated the license fee as a royalty in certain respects. In negotiating the license fee, the University attempted, as is common with royalties, to base the amount on the value of the invention. Bryan's May 23, 1990 letter to Watson states:

Traditionally, license issue fees for royalty-bearing licenses are based on about $\frac{1}{10}$ of your total market sales in a mature year. Because this license carries no running royalties, I would argue it is appropriate to base the license issue fee on the total market over the life of the patent. I believe that the additional market of perfusion deficit mapping will result in much more than $30,000 total revenue (or ten

times your suggested License Issue Fee of $3,000) to Salutar over the life of the patent, otherwise you would not be interested in pursuing it.

Further, on June 15, 1990, Bryan sent a copy of the executed License Agreement to Watson at Salutar. The letter, which was copied to both Kucharczyk and Moseley, states: "My inventors are copied on this letter to let them know the license is in place and that they will see a modicum of money from it eventually, although not until 1992." Finally, the University gave plaintiffs' 50% of the license issue fee in accordance with its obligation under the terms of the Patent Agreement.

The Court finds that in this case, the paid-up license issue fee can properly be considered a royalty because it is "compensation paid by the licensee to the licensor for the use of the licensor's patented invention." *Hazeltine,* 100 F.2d at 16 (footnote omitted). The Court therefore finds that the University decision to enter into a License Agreement that did not bear a running royalty was not arbitrarily and capricious because the agreement did require some type of royalty, as required by the Summary and the Research Funding Agreement.

### 4. *Evaluation of Invention*

The Patent Policy obligates the University to evaluate patented inventions and the University's patent rights. Further, the Summary not only obligates the University to obtain a royalty-bearing license, but also provides that licenses should "normally require a license issue fee and appropriate minimum annual royalties." Plaintiffs argue the University failed to properly evaluate the commercial value of their invention. They argue that had the University properly evaluated their invention, it would never have agreed to a license issue fee of only $25,000. They also contend that the University acted arbitrarily and capriciously in granting a license without a running, minimum annual royalty.

---

**16.** Kucharczyk denies that Bryan told him getting a royalty would be difficult. Whether or not he was told is irrelevant to the Court's analysis.

The administrative record shows that Salutar was unwilling to pay a running royalty from the start, and that it was initially willing to pay significantly less than $25,000. They first offered between $1,000 and $5,000. The record also shows that the University was motivated in part by a desire to continue its relationship with Salutar, and that Kucharczyk shared in that desire.

In a memo to the file dated February 26, 1990, Bryan wrote that she talked to Kucharczyk and that he confirmed that Salutar provided the chemical complexes used in the process, that Salutar wanted to file an application as quickly as possible, and that Salutar "wants to fund further research under a written R[esearch] A[greement]. The notes further indicate that this research funding was a "prime consideration" for Kucharczyk.

From the start, Salutar expressed its unwillingness to pay a royalty. Bryan's memo to the file dated March 1, 1990 states that "Nycomed [Salutar] refuses to pay royalty on *their product*" (emphasis in original) and that she informed Kucharczyk of that. Another memo to the file dated the same date states: "it's Nycomed's compound and they also have undivided interest in the method." The memo stated that Salutar was unwilling to pay more than $3,000 for a licensing fee. It stated: "They don't need us! Inventor wants r[e]s[ear]ch funding—we're stuck. They can file without us and walk away."

The administrative record further shows that Salutar was willing to pay only a small amount. On March 8, 1990, Bryan wrote to Watson:

> The license shall include a license issue fee, the amount of which will be the subject of future negotiations between the University and Hafslund Nycomed. The license fee shall reflect the agreed commercial value of the invention and shall be based on commercially reasonable criteria, but shall not exceed $25,000. The license agreement will not include a running royalty based on the sale of your present and future products.

Salutar's Norwegian parent company was initially dissatisfied with this agreement and insisted that the above-quoted language be replaced with: "[t]he license fee shall be between USD 2,000 and USD 5,000 depending upon the valid claims in the US-patent. The license agreement will not include a running royalty based on the sale of your present and future products." The March 8, 1990 letter from Tore B. Tjaberg, Vice President of Hafslund Nycomed to Watson continued: "It is imperative that a precise wording as suggested above shall be included. If not it is unlikely that the patent will be filed tomorrow." On March 9, the University prevailed and Salutar agreed to the license fee cap of $25,000 rather than of $5,000.

In mid-April of 1990, Salutar and the University began negotiating the license fee. The negotiations were affected by the fact that there was no royalty on the process. In a letter dated April 19, 1990, Bryan stated: "Because the University normally charges a minimum annual royalty, as well as a royalty on sales, the lack thereof in this license gives us cause for concern in the diligence provisions." The University initially sought the upper limit of $25,000. Throughout April, Salutar continued to seek a $3,000 license fee which Salutar stated in an April 30 letter to the University, "reflects our perception of the likely commercial value of this patent application, from an income-producing perspective. There is significant prior art already in this area, and should a patent issue, the difficulty in establishing infringement where Methods of Use are concerned is self-evident." The University pressed hard for a Licensing Fee at the top of the cap, arguing that the amount should reflect the value of the patent. The University again eventually prevailed, and the University and Salutar agreed on a payment 25 times greater than that initially proposed by Salutar.

The Court finds that the valuation of the invention and the $25,000 licensing fee were not arbitrary or capricious. Plaintiffs cite the CompTech grant application, which states at page 33:

> Completion of the Project will have a significant positive impact on rapid commercialization of DyDTPA–BMA which is not available commercially at the present time, but for which there is a major market opportunity. It is anticipated that experience gained during this project will lead to

better and more complete marketing strategies and market acceptance of the drug, with anticipated annual revenues in excess of $280 million at maturity.

Although Salutar stated that revenues from the drugs (and not from the process) would be approximately $280 million, it appears from the administrative record that there were significant obstacles to getting a higher royalty. Salutar owned the patent to the chemical compound, so that no other company would be interested in paying for plaintiffs' method of using Salutar's compound. Thus, the University was negotiating with the only interested party—a traditionally weak bargaining position. In addition, Salutar had an undivided interest in the invention and could thereby use the invention without any consent from the University as well as without paying a license fee. Furthermore, Kucharczyk remained interested in maintaining a relationship with Salutar. In light of the fact that it was possible that the University would not get any licensing fee, the Court finds that there is evidentiary support for the University's departure from the "normal" requirements of the CompTech Summary and other applicable guidelines. The Court finds that the University adequately considered all the equities, including the public interest in University research. The Court therefore finds that the University did not act arbitrarily or capriciously with respect to either valuing the invention, or in obtaining a paid-up license fee in the amount of $25,000 rather than a running royalty.

### 5. Patent Application

The Court also finds that the University's conduct in filing the Patent Application was not arbitrary or capricious. The University retained counsel to protect its rights. While plaintiffs argue that the counsel should have considered the patent application differently, the Court finds that in retaining reputable counsel, the University adequately fulfilled its obligations pursuant to the Patent Policy.

Having reviewed the entire administrative record, the Court concludes that the University did not act arbitrarily and capriciously in entering into the Licensing Agreement. The Court finds that the University "adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute." *California Hotel & Motel Assn.*, 25 Cal.3d at 213, 157 Cal.Rptr. 840, 599 P.2d 31. For that reason, the Court grants summary judgment in favor of the University on these claims.

## VIII. TORT CLAIMS

Finally, the University has moved for summary judgment on plaintiffs' tort claims. Plaintiffs allege the following tort causes of action: their sixth cause of action alleges tortious breach of contract; their seventh cause of action alleges fraud and deceit; in their eighth cause of action, plaintiffs allege negligent misrepresentation; and in their ninth cause of action, plaintiffs allege interference with contract.

The University contends that it is immune from tort liability as a matter of law. Plaintiffs disagree.

The California Tort Claims Act sets forth the statutory scheme relating to the tort liability of state agency. The Tort Claims Act includes the Regents of the University of California within its definition of public entities. Cal.Govt.Code § 811.2. It further provides that, except as otherwise provided by statute, a "public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." Cal. Govt.Code § 815. It additionally provides that "[a] public entity is not liable for an injury caused by an employee of the public entity, whether or not such misrepresentation be negligent or intentional." Cal. Govt.Code § 818.8.

██ . Plaintiffs argue that tort immunity does not apply in this case because of the application of Cal.Govt.Code § 815.6, which provides:

Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity estab-

lishes that it exercised reasonable diligence to discharge the duty.

California courts have held that "[b]efore the state will be required to confront a rebuttable presumption of negligence, plaintiff must demonstrate that (1) the statute which was violated imposes a mandatory duty, (2) the statute was intended to protect against the type of harm suffered, and (3) breach of the statute's mandatory duty was a proximate cause of the injury suffered." *Braman v. California,* 28 Cal.App.4th 344, 349, 33 Cal. Rptr.2d 608 (1994) (citations omitted).

The Court finds that plaintiffs have failed to meet the first part of this three-part test. Plaintiffs argue the Patent Policy imposes a mandatory duty to obtain a royalty if a license is given to an industrial research sponsor, again citing the Summary. However, as the Court found above, the Summary is not part of the Patent Policy. Therefore, there is no mandatory duty to obtain a royalty, and § 815.6 does not apply.

 Plaintiffs also argue that immunity for misrepresentations pursuant to § 818.8 does not apply, arguing that their claims "sound in contract." The Court agrees that public entities do not enjoy immunity from liability based on contract. However, whether the action falls within the Tort Claims Act immunity for tort claims does not depend on the form of pleading or relief sought, but rather on the source of the duty. *Arthur L. Sachs v. City of Oceanside,* 151 Cal.App.3d 315, 322, 198 Cal.Rptr. 483 (1984). "Whether an action is based on contract or tort depends upon the nature of the right sued upon, not the form of the pleading or relief demanded. If based on breach of promise it is contractual; if based on breach of a non-contractual duty it is tortious." *Id.* Here, there is no contract requiring a running royalty, and no contract imposes the duty the plaintiffs seek to enforce.

Accordingly, the Court finds that the University is immune and that summary judgment must be granted on plaintiffs' tort claims based on their claim that the University was required to procure running royalties. The Court therefore will grant the University's motion for summary judgment on grounds of tort immunity.

## IX. CERTIFICATION

Title 28 U.S.C. § 1292(b) gives a district court the discretion to certify an order for interlocutory appeal when the order involves "a controlling question of law as to which there is substantial ground for difference of opinion." The Court finds that the question of whether mandamus review applies in this case is a controlling question of law, and that there is ground for difference of opinion. The Court therefore certifies this order for interlocutory appeal.

## X. CONCLUSION

For the foregoing reasons and for good cause shown, the Court HEREBY ORDERS as follows:

1. Plaintiffs' motion for summary judgment is DENIED.

2. The University's motion for summary judgment is GRANTED to the extent set forth above and as follows:

a. Summary judgment is GRANTED in favor of the University on plaintiffs' Third Claim seeking rescission of their contracts with the University;

b. Summary judgment is GRANTED in favor of the University on plaintiffs' Fourth Claim seeking damages for breach of contract to the extent set forth above;

c. Summary judgment is GRANTED in favor of the University on plaintiffs' Fifth Claim for conspiracy to induce breach of contract;

d. Summary judgment is GRANTED in favor of the University on plaintiffs' Sixth Claim for tortious breach of contract;

e. Summary judgment is GRANTED in favor of the University on plaintiffs' Seventh Claim for fraud and deceit;

f. Summary judgment is GRANTED in favor of the University on plaintiffs' Eighth Claim for negligent misrepresentation; and

g. Summary judgment is GRANTED in favor of the University on plaintiffs' Ninth Claim for fraud in the inducement.

3. The Court has not addressed plaintiffs' Tenth Claim which alleges interference with contract by Salutar.

4. Pursuant to 28 U.S.C. § 1292(b), the Court certifies to the Ninth Circuit the issue of the standard of review to be applied to the University's decision to enter into the Licensing Agreement.

5. The Court will hold a status conference on December 9, 1996 at 8:45 a.m. to discuss the status of plaintiffs' remaining claims. If the Ninth Circuit accepts this matter for interlocutory review, the parties should contact the Court and ask that the conference be continued.

IT IS SO ORDERED.