John KUCHARCZYK, an individual, and Michael Moseley, an individual, Plaintiffs,

v.

The REGENTS OF THE UNIVERSITY OF CALIFORNIA, Nycomed Salutar, a California Corporation; and Nycomed Imaging as, a Norwegian business entity, Defendants.

Nos. C 94–3886 CRB, C 96–2247 CRB.

United States District Court, N.D. California.

May 6, 1999.

## MEMORANDUM AND ORDER

BREYER, District Judge.

Plaintiffs John Kucharczyk and Michael Moseley have filed suit against UC Regents and the Nycomed defendants (Nycomed Salutar and Nycomed Imaging A.S., collectively "Nycomed"), alleging that they acted to improperly deprive plaintiffs of their rightful share of the financial rewards of a patented medical technique they developed. A number of summary judgment motions are presently before the Court.

## BACKGROUND

### A. The Patent

The dispute arises out of the invention of a particular kind of magnetic resonance imaging technique ("MRI"). MRI is a process whereby physicians obtain an image of an internal part of the body in a way that allows them to discover a contrast between healthy and diseased tissues. This contrast is enhanced through the use of "contrast agents" that are injected into the patients undergoing MRI.

One particular type of magnetic resonance imaging is "perfusion MRI," which is a technique for detecting and determining the extent of blood flow in body tissues, and thereby detecting the presence

of any blood flow abnormalities. Plaintiffs invented a particular method for conducting perfusion MRI, which was ultimately patented as U.S. Patent No. 5,190,774. The abstract for that patent describes the invention as follows:

> The invention provides a method of detecting blood flow abnormality or variation in a human or non-human body, said method comprising administering into the cardiovascular system of said body a contrast enhancing amount of intravascular *paramagnetic metal containing magnetic resonance imaging contrast agent,* subject said body to a magnetic resonance imaging procedure capable of generating from magnetic resonance signals from said body a series of temporally spaced images of at least part of said body into which said agent passes and detecting temporal variations in said signals or images whereby to identify regions of abnormal or modified blood flow in said body and to indicate the degree of blood flow abnormality or modification therein.

'744 Patent. An important key to this method is the existence of a "paramagnetic metal containing magnetic resonance imaging contrast agent" (italicized portion above), which is to be injected into the body for the performance of the MRI.

### B. Conception and Development of the Invention

Plaintiffs conceived of this method for perfusion MRI during the late 1980s[1] while they were employed with the University of California at San Francisco as professors of radiology. During the course of their employment, their research was being funded, at least in part, by the Nycomed defendants. Plaintiffs claim that they discovered a way to use contrast agents to conduct a particular kind of perfusion MRI. This is the method that was ultimately claimed in the '744 patent.

---

1. The exact time at which the invention was conceived and reduced to practice is subject to considerable dispute.

The italicized portion of the language quoted above references the type of contrast agent that was used with the method—a "paramagnetic metal containing magnetic resonance imaging contrast agent." Nycomed had invented a contrast agent of this type, entitled S–043. Nycomed's interest in plaintiffs' research stemmed from its desire to develop an MRI technique which would incorporate the use of S–043.

On February 23, 1990, Dr. Kucharczyk faxed a disclosure form to the University's Patent Office describing the invention and identifying Nycomed as the funding source. This disclosure form indicated that Dr. Scott Rocklage of Nycomed was a co-inventor of the method, and the subsequent application to the U.S. Patent Office indicated this as well. Shortly thereafter, pursuant to the terms of their employment with UCSF, plaintiffs entered into an assignment agreement which transferred all their rights in the invention to the University.

In June 1990, the University entered into a license agreement with defendant Nycomed,[2] whereby Nycomed agreed to pay the University a total of $25,000 for the exclusive right to the '744 patent. Pursuant to the assignment agreement and patent agreement signed by the plaintiffs, as well as the University's patent policy,[3] the University paid half of this money to the plaintiffs.

### C. The Dispute

Plaintiffs claim that the method which they have invented is worth substantially more than $25,000. They allege that the University failed to conduct a proper investigation into the nature and origin of the invention before entering into negotiations with Nycomed, thereby leading to a licensing agreement that was grossly one-sided. This, plaintiffs argue, constituted a breach of the University's contractual obligations to Dr. Kucharczyk and Dr. Moseley. Plaintiffs further argue that Nycomed committed numerous fraudulent misrepresentations to the University and to the inventors during the course of these negotiations, again leading to the completion of a grossly one-sided licensing agreement in Nycomed's favor.

Plaintiffs assert, for example, that Nycomed falsely misrepresented that Dr. Rocklage was a co-inventor of the method, thereby causing the University to believe that Nycomed (to whom Rocklage had assigned his rights in the patent) already possessed an undivided right in the method. They argue that Rocklage was not truly a co-inventor, meaning that Nycomed did not already possess a right to use the method, which in turn meant that the licensing agreement was much more valuable to Nycomed and it would have paid more to the University.

Plaintiffs also argue that Nycomed grossly underrepresented the value of the contemplated licensing agreement, knowing that the company actually stood to make millions of dollars from it. Again, these fraudulent misrepresentations allegedly caused the University to enter into a lopsided agreement with Nycomed. Further, plaintiffs argue that minimal investigation by the University would have revealed the fraud and would have caused the University to obtain more valuable consideration for itself and for plaintiffs in exchange for the license. Indeed, plaintiffs argue that the University could have successfully obtained a substantial running royalty for the sale of Nycomed's contrast agent, S–043.

### D. Procedural History

This lawsuit was filed more than five years ago and is presently on its third district judge. First, on September 11, 1996, Judge Eugene Lynch issued a published decision granting summary judg-

---

**2.** The company was called Salutar at the time—Nycomed later acquired Salutar.

**3.** These documents are described in more detail below.

ment for the University on most of the claims against it. *Kucharczyk v. Regents of the University of California,* 946 F.Supp. 1419 (N.D.Ca.1996). He ruled, *inter alia,* that the plaintiffs could not properly rescind the agreement by which they had assigned their rights in the patent to the University, nor could they bring actions against the University that sounded in tort. As to plaintiffs' breach of contract claim, Judge Lynch issued a partial ruling, as explained below.

In order to reach his partial ruling on plaintiffs' breach of contract claim, Judge Lynch was required to conduct some assessment of the University's contractual obligations to the plaintiffs. In this respect, he ruled that, as a general matter, the University had no contractual obligation to obtain a running royalty in exchange for the grant of an exclusive license to a patented invention. *Id.* at 1432. This, at the time, was plaintiffs' primary legal argument.

Thus, because the University had no *per se* contractual obligation to its employees to obtain a running royalty in exchange for a license to use its inventions, and because the University is a public entity, Judge Lynch reviewed plaintiffs' claim for a running royalty using the "arbitrary and capricious" standard rather than the "breach of contract" standard, relying only on the "closed record" of information that was available to the University at the time. He suggested that because plaintiffs had no contractual right to a running royalty, they were in essence making a challenge to the licensing agreement between the University and Nycomed. This agreement, Lynch suggested, was quasi-legislative in nature and thus required review under the arbitrary and capricious standard.

Applying this standard, Judge Lynch first rejected plaintiffs' claim that the University was arbitrary and capricious in entering into the license agreement without investigating whether Scott Rocklage was truly a co-inventor of the method. He cited the fact that plaintiffs themselves informed the University, in the disclosure form that Dr. Kucharczyk sent to the University's patent office, that Rocklage was a co-inventor. *Id.* at 1440. Furthermore, the Judge found that "though plaintiffs were well aware that the University was treating Rocklage as an inventor, and plaintiffs were familiar with their invention and its genesis, they never challenged that treatment." *Id.* at 1442.

Judge Lynch further held that the University's decision to enter into the licensing agreement for $25,000 up front, without royalty payments, was not arbitrary and capricious based on the facts disclosed in the administrative record. For example, the disclosure form that Dr. Kucharczyk faxed to the University patent office indicated that Nycomed was the only funding source for the invention. *See id.* at 1439. The Judge also found that "[f]rom the beginning [Nycomed] was unwilling to pay a royalty because they owned the patent to the compound used in the plaintiff's method," and that Nycomed was only willing to pay a small amount for the license. *Id.* at 1439, 1443. He further emphasized that the University's negotiating position was colored by the fact that both the Regents and plaintiff Kucharczyk himself wanted to maintain a research funding relationship with Nycomed. *Id.* at 1443.

Despite this ruling, Judge Lynch left "for another day" the question whether the University had violated some other contractual duty to plaintiffs. For example, although he found that the University was not arbitrary and capricious in not conducting further investigation on the question whether Dr. Rocklage truly was a coinventor, he explicitly reserved the question whether the University had a *contractual* duty to the plaintiffs to conduct an inventorship audit. *See id.* at 1432, fn. 10. He also reserved the question whether the University had a contractual duty to properly inform itself regarding the nature and value of the invention before negotiating a license agreement with Nycomed. *See id.*

Next, in November 1997, the University brought a summary judgment motion before Judge Maxine Chesney on plaintiffs' remaining claims against it.[4] These claims included the question whether Dr. Rocklage was a true coinventor of the method and the question whether the University had breached some contractual obligation to the plaintiffs in conjunction with its granting of the license to Nycomed. Judge Chesney denied summary judgment on the question of who invented the patent, on the grounds that a triable issue of fact existed "with respect to the equitable defenses of estoppel and laches, and defendant has failed to make a prima facie showing as to assignor estoppel." She also denied the University's summary judgment motion on plaintiffs' breach of contract claims. Judge Chesney emphasized the fact that only limited discovery had taken place up to that point, suggesting that plaintiffs had not yet been given a fair opportunity to present facts that would warrant a denial of summary judgment.

In December 1998, Nycomed moved for summary judgment in this Court on all claims against it. In addition, Nycomed moved to dismiss the complaint on the grounds that even if Nycomed was liable in contract or in tort, plaintiffs had suffered no damages because the '744 patent was worthless. The Court rejected this latter claim, ruling that if plaintiffs are able to establish that Nycomed fraudulently caused them to receive a lesser payment in connection with the licensing agreement, they will, by definition, show that they were damaged. The Court then denied Nycomed's summary judgment motion on the grounds that plaintiffs had not yet been granted adequate discovery. The Court then lifted the stay on discovery and informed Nycomed that it could renew its summary judgment motion at the close of discovery.

**4.** Adjudication of plaintiffs' claims against the Nycomed defendants had been stayed pending the resolution of the University's summary judgment motions.

### F. Motions Currently Before the Court

Discovery having been largely completed, the parties have filed or renewed various motions:

#### 1. Breach of contract claim against University

First, plaintiffs seek summary judgment on their third claim for relief, which alleges breach of contract by the University for, *inter alia*, failure to determine the nature of the invention, failure to determine the true inventors, failure to determine the true sponsors of the inventors' research, and failure to determine the value of the patent before granting a license to Nycomed. The University has filed a cross-motion for summary judgment on this issue, arguing that: 1) no such contractual obligations exist, and 2) to the extent that they may exist, they were not breached in the present case.

#### 2. Claims against Nycomed

Second, Nycomed seeks summary judgment on all claims against it. Plaintiffs' second amended complaint asserts the following causes of action against Nycomed:

* Declaration of Sole Inventorship (First Claim for Relief): plaintiffs first ask the Court to declare that they are the sole inventors of the method claimed in the '744 patent, arguing that the inclusion of Nycomed employee Scott Rocklage as a co-inventor was erroneous. Plaintiffs bring this claim under 35 U.S.C. § 256.

* Breach of Contract (Fourth Claim for Relief): plaintiffs allege that Nycomed breached its research funding agreement[5] with the University, and assert that as third-party beneficiaries to that contract, they may recover for the breach.

**5.** This agreement is described below.

\* Inducing Breach of Contract (Fifth Claim for Relief): plaintiffs further allege that Nycomed engaged in fraudulent conduct which caused the University to breach its contract with plaintiffs. They first allege that their contract with the University required that the University obtain ongoing royalty payments from Nycomed for the patent, half of which would have belonged to plaintiffs. As explained above, however, Judge Lynch has already disposed of this issue; he has ruled that the University did not have a *per se* contractual obligation to obtain a running royalty from Nycomed. However, plaintiffs also allege that the University had the contractual obligation to pursue negotiations vigorously, conduct an investigation as to who was the true inventor, and obtain consideration in accordance with industry standards. As indicated above, Judge Lynch explicitly declined to resolve these questions in his order.

\* Fraud and Deceit (Eighth Claim for Relief): plaintiffs allege that Nycomed falsely represented to them that they would receive a substantial royalty for their invention of the method claimed in the '744 patent, and engaged in other fraudulent conduct which led to a grossly unfair licensing agreement.

\* Interference with Contractual Relations (Tenth Claim for Relief): plaintiffs allege that Nycomed, by committing fraud and by acting with the University to deprive plaintiffs of the true benefits of their invention, tortiously interfered with plaintiffs' contractual relationship with the University.

The primary thrust of Nycomed's summary judgment motion is that Judge Lynch's earlier ruling requires that these claims be disposed of. In addition, with respect to the sole inventorship claim, Nycomed argues that plaintiffs do not have standing to seek relief.

### 3. Declaration of sole inventorship

As mentioned above, plaintiffs' first cause of action seeks declaratory judgment that Scott Rocklage is not a coinventor of the '744 patent. Plaintiffs now move for summary judgment on that issue.

### 4. 42 U.S.C. § 1983 claim

Finally, plaintiffs have brought a civil rights claim against Carl Wooten, who was director of the University's Patent and Trade Office during the negotiations with Nycomed. They allege that his conduct during the course of negotiations deprived them of their due process rights, thereby rendering Mr. Wooten liable under 42 U.S.C. § 1983.

Mr. Wooten has moved for summary judgment on this claim, arguing, *inter alia,* that plaintiffs have failed to identify a constitutional right that was allegedly violated by him.

### LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A principal purpose of the summary judgment procedure is to identify and to dispose of factually unsupported claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [is]

no genuine issue for trial." *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## DISCUSSION

As indicated above, plaintiffs and the University have filed cross-motions for summary judgment on plaintiffs' third cause of action alleging breach of contract by the University. Next, Nycomed moves for summary judgment on all claims against it. Third, plaintiffs move for summary judgment on their first cause of action, seeking correction of inventorship on the '744 patent. Fourth, defendant Wooten moves for summary judgment on the civil rights claim asserted against him. The Court will address each of these questions in turn.

### A. Breach of Contract Claim Against the University

Although Judge Lynch has previously ruled that the University did not have a *per se* contractual obligation to plaintiffs to obtain a running royalty in exchange for the exclusive license that it granted to Nycomed, plaintiffs now argue that the University is liable for the violation of numerous other contractual duties.

These duties, plaintiffs argue, arise out of three documents—the assignment agreement, the patent agreement, and the University's patent policy. Plaintiffs entered into the assignment agreement shortly after disclosing their invention to the University, relinquishing all rights to the invention. They signed the patent agreement when they obtained employment with the University. In that contract, they agreed generally to relinquish their rights to inventions developed during the course of their employment with the University. Both of these contracts incorporate by reference the University's patent policy. Indeed, the assignment agreement provided that plaintiffs would relinquish all rights and interests in their invention in exchange for the University exercising its duties as set forth in the patent policy. The patent policy contains the language which, plaintiffs argue, imposed upon the University the contractual duties that are at issue in the case.

The preamble of the patent policy states as follows:

> It is the intent of the President of the University of California, in administering the intellectual property rights for the public benefit, to encourage and assist members of the faculty, staff and others associated with the University in the use of the patent system with respect to their discoveries and inventions in a manner that is equitable to all parties involved.

In the "statement of policy" portion of the document, it is provided, *inter alia*, that employees must assign their inventions and patents to the University. This section further states that "the University agrees, for and in consideration of said assignment of patent rights, to pay annually to the named inventor(s) ... 50% of the net royalties and fees received by the University." [6]

Finally, in the section entitled "Patent Responsibilities and Administration," the policy sets forth the roles that the various parties play in the system. It provides that the Senior Vice President "is responsible for implementation of this Policy," including the following:

> 1. Evaluating inventions and discoveries for patentability ...
>
> 2. Evaluating the patent or analogous property rights or equities held by the University in an invention, and negotiating agreements with cooperating organizations, if any, with respect to such rights or equities.

---

**6.** Judge Lynch has properly interpreted this provision not to require the University to provide royalties in all instances. Rather, as the policy states earlier, the University must provide the inventor with 50% of the royalties *only if such royalties have been obtained.*

3. Negotiating licenses and license option agreements with other parties concerning patent and/or analogous property rights held by the University.

4. Directing and arranging for the collection and appropriate distribution of royalties and fees.

5. Assisting University officers in negotiating agreements with cooperating organizations concerning prospective rights to patentable inventions or discoveries made as a result of research carried out under grants ...

■ There can be no doubt that the above-cited provisions impose some contractual obligations upon the University, in light of the fact that the patent policy is expressly incorporated into the assignment agreement. However, plaintiffs assert that a number of more specific duties must be implied from these provisions: 1) a duty to conduct a formal investigation to determine the "true nature" of the invention; 2) a duty to make a formal determination as to who was the true inventor of the method; 3) a duty to determine the true research sponsor of the invention, and; 4) a duty to determine the true value of the invention.

As a preliminary matter, it is not clear from plaintiffs' written or oral submissions whether they believe these precise duties exist every time the University negotiates a licensing agreement with a private entity, or just in this specific factual context. To the extent that they argue that the patent policy imposes these four obligations upon the University *per se*, plaintiffs have presented no evidence in support of this notion. Indeed, the uncontroverted testimony of Dr. Wooten, president of the University's patent office at the time, establishes that the University conducted a formal inventorship determination with respect to the inventions of its employees only on the rare occasion that concerns arose about inventorship. Nor have plaintiffs shown that the University was required to go behind the inventors' uncontroverted representations to

conduct further investigation into the "true funding source" of the invention. Given the absence of any evidence to the contrary, the Court finds that the patent policy does not subject the University to the contractual obligations asserted by the plaintiffs on a *per se* basis.

Rather than requiring the University to complete the specific steps set forth by the plaintiffs, it is clear from the language of the patent policy and the customary manner in which the University discharges its duties pursuant to this policy that the contract calls for the University to exercise a substantial amount of discretion when fulfilling its role in the intellectual property system. For example, the provision that gives the University responsibility for "[n]egotiating licenses and license option agreements with other parties" clearly implies that the University will exercise its discretion in conducting such negotiations; the policy does not impose a particular procedure that the University must follow, nor a particular substantive goal that the University is required to achieve.

■■ Of course, the fact that the patent policy leaves much to the discretion of the University does not mean that the University has no contractual obligation to plaintiffs. "Where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." *Perdue v. Crocker National Bank*, 38 Cal.3d 913, 923, 216 Cal.Rptr. 345, 702 P.2d 503 (1985); *see also Locke v. Warner Bros., Inc.*, 57 Cal.App.4th 354, 363, 66 Cal.Rptr.2d 921 (1997). In this spirit, plaintiffs suggest that given the facts and circumstances of the present case, the University's failure to conduct a formal inventorship determination, a determination as to who was the true funding source of the invention, and a thorough investigation into the "true nature" of the invention constituted a breach of contract. In other words, they suggest that even if the

University does not have a *per se* contractual obligation to conduct these activities, its failure to do so in this particular case was an act of bad faith.

Again, however, plaintiffs have failed to submit evidence that the University acted in bad faith. Viewing the evidence in the light most favorable to plaintiffs, the most that can be said is that the University was misled into signing away its rights to the patented method for substantially less than those rights were worth.

This purported error was caused by a number of factors, not the least of which was plaintiffs' own failure to submit what they now claim to be the proper information to the University. For example, plaintiffs contend that the University failed to properly determine the inventors of the patented method, yet it was plaintiffs who initially informed the University, through the disclosure form faxed by Dr. Kucharczyk, that Dr. Rocklage was a co-inventor. Indeed, as Judge Lynch found, plaintiffs were aware for years that the University treated Dr. Rocklage as a co-inventor and never did anything to contradict this view. The University did not act in bad faith by failing to go beyond the representations and repeated confirmations of its employees—who were, after all, most familiar with the invention—to conduct an investigation as to whether these representations were correct.

Another factor contributing to the error, according to plaintiffs, was Nycomed's fraudulent misrepresentations to the University regarding the invention's profit-making potential. Again, plaintiffs present no evidence that University officials somehow sanctioned or took part in these misrepresentations. Nycomed's alleged misrepresentations are, of course, relevant to the question whether Nycomed may be liable to plaintiffs, as discussed below. However, the evidence that plaintiffs have presented in this regard provides further indication that the University did not act in bad faith. For example, plaintiffs present evidence that Nycomed told the University that the patent was essentially valueless, while at the same time telling plaintiffs that they would become wealthy once the patent was approved. *See* Section C, *infra*. This evidence, if true, supports the notion that plaintiffs and the University were both "duped" by Nycomed, and contradicts the notion that the University acted in bad faith.

Furthermore, plaintiffs have failed to explain why the University would have acted in bad faith when conducting negotiations with Nycomed. Indeed, the purported mistake harmed the University as much as the plaintiffs—each was entitled to 50% of the revenue derived from the licensing agreement. Plaintiffs have not provided any evidence to explain why the University might have intentionally derogated its responsibilities in order to help Nycomed, thereby depriving the Regents of substantial income.

Plaintiffs may very well be correct that the University would have negotiated a running royalty or some other more valuable consideration in exchange for the license had it conducted a more thorough investigation into the nature and origin of the invention.[7] This fact, however, does not confer a valid breach of contract claim upon the plaintiffs.[8] Plaintiffs have failed to submit evidence upon which a reasonable jury could conclude that the Universi-

7. The Court, of course, makes no finding in this regard.

8. If the Court were to accept plaintiffs' argument to the contrary, it would be tantamount to imposing strict liability upon the University for the actions of the patent office. If this were the true meaning of the patent policy, an inventor could sue the University any time he felt that the University errantly underestimated its bargaining power *vis a vis* a commer-cial entity who wished to purchase a license to the invention. More generally, every time the University made an error while exercising its duties as set forth in the patent policy, the person who would have received more money but for that error would be allowed to sue for breach of contract. Logic, as well as the plain meaning of the patent policy, belies such an interpretation.

ty acted in bad faith.[9] Therefore, the Regents' cross-motion for summary judgment on plaintiffs' third cause of action must be granted.[10]

### B. Nycomed's Motion for Summary Judgment on Plaintiffs' Inventorship Claim

Plaintiffs' first claim for relief arises under 35 U.S.C. § 256, which creates a federal cause of action for correction of inventorship. The statute reads as follows:

Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Commissioner may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Commissioner shall issue a certificate accordingly.

35 U.S.C. § 256.[11]

Defendants have moved for summary judgment on this question, based on the argument that plaintiffs do not have standing to seek a correction of inventorship.[12] Plaintiffs respond with their own motion for summary judgment, arguing that in addition to having standing, they are able to demonstrate as a matter of law that Dr. Rocklage was not a co-inventor. However, it is unnecessary for the Court to determine inventorship under section 256, because defendants are correct that plaintiffs have no standing to assert this claim.

As mentioned earlier, the Regents' patent policy expressly required plaintiffs to assign title to any inventions to the Regents as a condition of their employment. In connection with the invention that was eventually claimed in the '744 patent, plaintiffs executed an assignment agreement pursuant to the patent policy transferring their "entire right, title and interest" in the patent to the Regents "for its own use ... *as fully and entirely as the same would have been held and enjoyed by the assignors had this sale and assignment not been made.*" (emphasis added).

Plaintiffs do not dispute that the University is the proper owner of the '744 patent. Thus, regardless of whether Dr. Rocklage is listed as a co-inventor or not, plaintiffs will have no interest in the patent whatsoever. The only reasonable interpretation

**9.** Indeed, plaintiffs have even failed to present evidence that the University deviated from its normal practice with respect to the negotiation of licensing agreements.

**10.** Plaintiff argue that summary judgment in favor of the Regents is inappropriate at this stage because they not yet had the opportunity to present evidence of other contractual duties that the University may have breached. This argument is difficult to swallow. The Regents have moved for summary judgment on this issue, thereby requiring plaintiffs to present evidence that creates a genuine factual dispute on the question whether the University breached its contracts with the plaintiffs. Having failed to do so in the voluminous written material submitted in connection with these motions, plaintiffs cannot

now claim that they have not been given the opportunity to flesh out all of their theories. This is particularly true in light of the fact that this lawsuit is more than five years old.

**11.** The Federal Circuit has held that the "no deceptive intention" threshold of section 256 only applies to nonjoinder situations, not misjoinder situations. *See Stark v. Advanced Magnetics, Inc.,* 119 F.3d 1551 (Fed.Cir. 1997). Therefore, because plaintiffs are arguing that Dr. Rocklage has been misjoined, they are not required to demonstrate a lack of deceptive intent on the part of Nycomed.

**12.** Because this is in fact a jurisdictional question, the Court shall treat Nycomed's motion regarding section 256 as a motion to dismiss pursuant to Rule 12(b).

974

of the assignment agreement is that plaintiffs relinquished their right to sue to correct inventorship—along with all other rights pertaining to the patent—when they executed the contract.

Plaintiffs respond that even though they assert no ownership interest in the patent, they nonetheless retain an interest in preventing the patent from erroneously listing Dr. Rocklage as their co-inventor. They suggest that section 256 grants them standing to assert this interest by virtue of its requirement that "all parties concerned" be noticed when a court is entertaining a claim for correction of inventorship. However, plaintiffs have been unable to provide any reference to the legislative history of the statute that would demonstrate a Congressional intent to allow someone who has disclaimed all rights and interests in a patent to sue for a correction of inventorship. Rather, as the entirety of the case law demonstrates, the statute is invoked when an errant or fraudulent listing of inventorship allegedly deprives the plaintiff of his rightful ownership interest in the patent. *See, e.g., Stark v. Advanced Magnetics, Inc.,* 119 F.3d 1551 (Fed.Cir.1997); *Hess v. Advanced Cardiovascular Systems,* 106 F.3d 976 (Fed.Cir.1997); *MCV, Inc. v. King-Seeley Thermos Co.,* 870 F.2d 1568 (Fed. Cir.1989); *Heden v. Hill,* 937 F.Supp. 1222 (S.D.Tex.1996); *Fina Technology, Inc. v. Ewen,* 857 F.Supp. 1151 (N.D.Tex. 1994). If the section 256 inventorship determination impacts a plaintiff's ownership rights in a patent, that plaintiff naturally has an interest in bringing the claim. However, plaintiffs can point to no case in which an individual concededly had no ownership interest in a patent, yet invoked section 256 to correct the inventorship listing for that patent.

The one case plaintiffs cite in support of their contention that they may avail themselves of section 256 is unpersuasive. In *Fina Technology v. Ewen, supra,* a patent owner, Fina, sought a declaratory judgment under section 256 that the two listed

inventors were in fact the correct inventors of the patented invention. Fina sought this judgment in order to preclude one of the listed inventors, Ewen, from claiming that the other inventor, Razavi, was improperly listed. *Id.* at 1154–56. Ewen's claim in this regard was part of a larger effort in state court to contest Fina's ownership of the patent. *Id.* at 1153. Like the case at hand, the co-inventors had assigned their rights in the patent to Fina. *Id.* at 1158.

Although Razavi was not a party to the suit, the district court allowed him to "appear" as a concerned party pursuant to section 256. *Id.* at 1156. He did so to support the owner's claim that he was a co-inventor of the patent. However, Razavi further sought a declaration that he was the *sole* inventor of the patent at issue. The district court ruled that although Razavi could properly participate as a "concerned party" pursuant to section 256,

> "the Court does not read that section as allowing a concerned party to function as the equivalent of a party to the suit. Although Razavi has those rights provided by section 256, he may not seek affirmative relief—in this case, correction of inventorship—unless he intervenes. *It seems that he could also file a separate suit."*

*Id.* (emphasis added).

Plaintiffs seize on the *dicta* highlighted above and argue that a co-inventor has standing to file suit to remove the name of another ostensible co-inventor from a patent, even if the plaintiff has assigned all rights and interests in that patent. However, in light of plaintiffs' failure to make any showing that Congress intended to grant standing under section 256 to a plaintiff who seeks to remove the name of a co-inventor even though that plaintiff has relinquished all interest in the patent, the Court declines to adopt this *dicta* and construe the statute so broadly. Plaintiffs have assigned away all rights and interests in the '744 patent to the Regents. Should the Regents desire to remove the name of

Dr. Rocklage from the patent, it of course has standing under the statute to seek this remedy. However, the plaintiffs, having relinquished all interest in the patented invention, have also relinquished their standing to sue under section 256.

It is particularly appropriate to reject plaintiffs' interpretation of the statute in light of the serious constitutional questions such a broad interpretation would raise. As the Supreme Court has repeatedly explained, the "irreducible constitutional minimum" of standing contains three elements—actual injury, causation, and redressability. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). There is a strong possibility that plaintiffs fail to meet these constitutional requirements.

First, plaintiffs suggest that the "accuracy of the named inventors of a patent is an interest that an inventor has in the patent, irrespective of whether the inventor owns the patent." Plaintiffs' counsel elaborated on this theme at oral argument by arguing that Dr. Kucharczyk and Dr. Moseley should have standing because they are "proud" of their invention, and they are therefore injured by the presence of Dr. Rocklage's name on the patent. These assertions suggest that plaintiffs are seeking the kind of "psychic satisfaction [that] is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, ——, 118 S.Ct. 1003, 1019, 140 L.Ed.2d 210 (1998). If plaintiffs were correct that section 256 grants them standing on the grounds that they are proud of their invention, then the statute would be in grave danger of running afoul of Article III.

Second, plaintiffs argue that they were injured because, by fraudulently causing Dr. Rocklage's name to be included on the patent, Nycomed caused the plaintiffs to be deprived of substantial royalties that they otherwise would have received. Although this allegation sufficiently describes an "actual injury," removing Dr. Rocklage's name from the patent pursuant to section 256 would not redress it. To redress the injury arising out of Nycomed's alleged fraud, plaintiffs would have to obtain a jury verdict that such fraud occurred.

Although plaintiffs resist Nycomed's standing argument strenuously, this holding actually has no negative consequences for them.[13] As stated above, a declaration that they are the sole inventors of the '744 patent obtains them no ownership interest in the patent. Furthermore, dismissal of their section 256 claim does nothing to prevent plaintiffs from asserting their state law claims for fraud against Nycomed, because they are still free to establish that Nycomed fraudulently caused them and the University to believe Dr. Rocklage was a co-inventor.[14] This will be one important issue for the jury to consider when deciding if Nycomed is liable in tort to the plaintiffs. However, in light of plaintiffs' lack of standing under section 256, the Court does not have jurisdiction as a matter of law to determine inventorship pursuant to that provision. Accordingly, plaintiffs' first cause of action must be dismissed for lack of jurisdiction.[15]

## C. Nycomed's Summary Judgment Motion on Plaintiffs' Remaining Claims

After dismissal of the first cause of action under 35 U.S.C. § 256, four claims

---

**13.** This, of course, confirms the notion that plaintiffs fail to meet the "actual injury" and "redressability" requirements of Article III.

**14.** Indeed, to recover under their fraud claim, plaintiffs have a lower burden of proof with respect to the question of inventorship. Section 256 would have required plaintiffs to show that Rocklage was not a co-inventor by "clear and convincing evidence." However,

they need only satisfy the preponderance standard regarding Nycomed's fraudulent conduct.

**15.** Because plaintiffs lack standing to bring a claim under 35 U.S.C. § 256, their motion for summary judgment on their first cause of action is no longer applicable.

remain against Nycomed: 1) breach of contract, on the theory that Nycomed breached its funding agreement with the University, to which plaintiffs were allegedly third party beneficiaries; 2) inducing breach of contract, on the theory that Nycomed's misrepresentations caused the University to breach its assignment agreement and licensing agreement with plaintiffs; 3) fraud and deceit, based on Nycomed's overall conduct; and 4) interference with contractual relations.

In light of the Court's ruling that the University did not breach its contracts with plaintiffs, the claim against Nycomed for inducing breach of contract must fail as well. This leaves three claims against Nycomed to be adjudicated.

### 1. *Plaintiffs' tort claims*

■ Two of the remaining three causes of action against Nycomed sound in tort—plaintiffs' claims for fraud and deceit (Eighth Claim for Relief) and interference with contractual relations (Tenth Claim for Relief). These claims arise from the totality of plaintiffs' factual allegations regarding Nycomed's conduct.

Nycomed argues that Judge Lynch's opinion, which is the law of the case, disposes of these issues. However, as explained previously, Judge Lynch's ruling is actually quite narrow—he merely held that the University had no per se obligation to obtain a running royalty in exchange for a license in all cases, and that the University was not arbitrary and capricious in its decision to enter into the licensing agreement with Nycomed. Although the University was not *required* to obtain a running royalty, the question remains open whether the University *would have* obtained a running royalty but for Nycomed's fraudulent conduct

Further, although Judge Lynch ruled that the University was not arbitrary and capricious, that determination rested on his assessment of the information the University had before it at the time. This ruling does not preclude a finding that Nycomed improperly withheld information from the University, thereby defrauding the University into depriving itself and its employees of valuable consideration for the rights to the patent.

Plaintiffs have submitted sufficient evidence to create a genuine issue of material fact regarding Nycomed's fraudulent conduct, thereby warranting a denial of summary judgment on these two causes of action.

First, they submit declarations by Dr. Kucharczyk and his research assistant at the time, Ms. Asgari. Dr. Kucharczyk states that in January 1990, Nycomed patent manager Alan Watson told him that he believed the patent had great commercial value and that Kucharczyk and Dr. Moseley could expect significant royalties if the patent issued and was licensed to Nycomed. Ms. Asgari declares that Watson told her in 1991, *after the licensing agreement had been entered into,* that she and Dr. Kucharczyk would become rich from the patent and would never have to worry about money again.

Next, plaintiffs submit repeated correspondence between Watson and the University which took place between March 7 and March 9, 1990, in which Watson represented that the patent was of limited value and refused to offer a running royalty. Kucharczyk asserts that despite this insistence, and despite the fact that Watson was in contact with Kucharczyk during these dates, Watson never told Kucharczyk of his change in position regarding the value of the invention. Indeed, as mentioned above, Ms. Asgari claims that Watson was even misrepresenting his position regarding the value of the patent in 1991—after he had already entered into the agreement.

Plaintiffs further argue that if they had been aware of Nycomed's negotiating posture, they would have intervened to prevent themselves and the University from being defrauded. Nycomed would then have had to pay much more money for the license, or the University could have en-

tered into negotiations with another party. However, because Nycomed misled plaintiffs about its beliefs regarding the value of the invention, plaintiffs mistakenly believed that a substantial running royalty was being negotiated.

Next, Dr. Kucharczyk indicates that Nycomed made other representations, outside the context of its negotiations with the University, that the patent was extremely valuable. For example, UC and Nycomed applied jointly for a $150,000 research grant for the '744 patent and claimed that the commercialization of the method and its use with S–043 would produce "anticipated annual revenues in excess of $280 million at maturity." He also indicates that he attended a meeting with Dr. Rocklage in Pasadena in which Rocklage gave a video presentation which made the claim that S–043 had a market potential of $300 million. Dr. Kucharczyk claims that the only reason S–043 had developed such a substantial market potential is the development of the patented method. The fact that the method created a demand for S–043, he asserts, made the patent extremely valuable for Nycomed.

Based on the foregoing evidence, when viewed in a light most favorable to the plaintiff, there is a genuine issue of material fact on the question whether Nycomed defrauded plaintiffs and the University, thereby causing the University to sign away its valuable rights to the '744 patent for a minimal amount.

■ Furthermore, there is a genuine issue of material fact on the question whether Nycomed interfered with plaintiffs' contractual relations with the University. The elements of intentional interference with contractual relations are: 1) a valid contract between plaintiff and a third party; 2) defendant's knowledge of this contract; (3) defendant's intentional acts

designed to induce a breach *or disruption* of the contractual relationship;[16] (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *Quelimane Co. v. Stewart Title Guar. Co.,* 19 Cal.4th 26, 55–56, 77 Cal.Rptr.2d 709, 960 P.2d 513 (1998). At a minimum, the University was contractually obligated to give plaintiffs 50% of whatever they received in exchange for the license. As set forth above, plaintiffs have presented evidence that Nycomed was aware of this arrangement, and that the University's performance under this contract was adversely affected by the alleged fraud committed by Nycomed against plaintiffs and the University.

Therefore, Nycomed's motion for summary judgment on plaintiffs' eighth and tenth claims must be denied.

### 2. Breach of contract—third party beneficiary theory

Plaintiffs' fourth cause of action asserts that Nycomed breached its funding agreement with the University, and that plaintiffs have standing as third party beneficiaries to sue for this breach. The University and Nycomed entered into this research funding agreement on April 12, 1990. The agreement provided money to the University to fund Dr. Kucharczyk's research.

Nycomed argues that summary judgment is required by Judge Lynch's opinion, which held that "[b]ecause the plaintiffs are not parties to this agreement, the Court finds that the Research Funding Agreement does not confer any contract rights on them." 946 F.Supp. at 1431. It asserts that this finding by Judge Lynch encompasses the third party beneficiary situation and is the law of the case, thereby automatically defeating plaintiffs' fourth cause of action.

---

**16.** This element does not require that the actor's primary purpose be disruption of the contract. It also applies to situations "in which the actor does not act for the purpose of interfering with the contract ... but knows

that the interference is certain or substantially certain to occur as a result of his action." *Quelimane Co. v. Stewart Title Guaranty Co.,* 19 Cal.4th 26, 56, 77 Cal.Rptr.2d 709, 960 P.2d 513 (1998).

However, Judge Lynch did not specifically address the question whether plaintiffs were third party beneficiaries to the research funding agreement. Furthermore, after issuing his summary judgment ruling, Judge Lynch allowed plaintiffs to amend their complaint to assert this theory. In light of the fact that Judge Lynch allowed plaintiffs to amend their complaint, and in light of the fact that he did not specifically address the third party beneficiary question, this Court must assume that the question whether plaintiffs were third party beneficiaries to the research funding agreement has yet to be adjudicated.

■ California Civil Code Section 1559 provides that "a contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Here, the agreement explicitly indicates that it was designed to advance the research of Dr. Kucharczyk that specifically related to the '744 patent. Further, there is evidence that both Nycomed and the University knew that plaintiffs were entitled to 50% of any income received by the University in connection with a licensing agreement arising out of an invention financed by the research funding agreement. Therefore, plaintiffs may properly be considered third party beneficiaries to the research funding agreement.

■ Furthermore, there is a genuine factual dispute on the question whether Nycomed breached the research funding agreement. Paragraph 9.2 of that contract, which was adopted on April 12, 1990, states: "University and Sponsor agree to negotiate the signing of a mutually acceptable agreement covering the disposition of intellectual property rights and the licensing of any patentable New Invention prior to disbursement of Grant Funds." As indicated in the discussion of plaintiffs' tort claims above, there is a factual issue as to whether Nycomed defrauded the University during negotiations over the licensing agreement, which was adopted in June 1990. If Nycomed did so, it certainly would appear to have breached Paragraph 9.2 of the research funding agreement.

Therefore, there is a genuine issue of fact on the question whether Nycomed is liable to plaintiffs as third party beneficiaries of the research funding agreement. Nycomed's motion for summary judgment on this issue must be denied.

### D. Plaintiffs' Civil Rights Claim

Finally, plaintiffs argue that Carl Wooten, who was the director of the University's Patent Office during the relevant period, is liable under 42 U.S.C. § 1983 for violation of their constitutional rights. Wooten is clearly entitled to summary judgment on this claim.

To show that an official is liable under 42 U.S.C. § 1983, the plaintiff must first identify a specific constitutional right allegedly violated by that official. *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). In light of the fact that plaintiffs have not even shown that the University could have breached its contractual obligations to them, they certainly have not been able to identify a constitutional right that Dr. Wooten may have violated. Therefore, defendant Wooten is entitled to summary judgment on this claim.

### CONCLUSION

In light of the foregoing, the Court rules as follows:

Plaintiffs' motion for summary judgment on their third cause of action—alleging breach of contract against the University—is DENIED. The University's cross-motion for summary judgment on this cause of action is GRANTED.

Plaintiffs' first cause of action under 35 U.S.C. § 256 is DISMISSED for lack of subject matter jurisdiction.

Nycomed's motion for summary judgment on plaintiffs' fifth cause of action for inducing breach of contract is GRANTED.

Nycomed's motions for summary judgment on plaintiffs' fourth, eighth, and tenth causes of action, alleging breach of the research funding agreement, fraud, and interference with contractual relations, are DENIED.

Defendant Carl Wooten's motion for summary judgment on plaintiff's claim pursuant to 42 U.S.C. § 1983 is GRANTED.

**IT IS SO ORDERED.**